**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 15-4265**

———————

UNITED STATES OF AMERICA,

              Plaintiff - Appellant,

     v.

UNDER SEAL,

              Defendant - Appellee.

———————

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Gerald Bruce Lee, District Judge.  (1:14-cr-00347-1)

———————

Argued: December 8, 2015              Decided:  March 30, 2016

———————

Before AGEE and HARRIS, Circuit Judges, and Theodore D. CHUANG, United States District Judge for the District of Maryland, sitting by designation.

———————

Affirmed by published opinion.  Judge Agee wrote the opinion, in which Judge Harris and Judge Chuang joined.

———————

**ARGUED:** Julia K. Martinez, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellant.  Keva Jeannette McDonald, THE LAW OFFICE OF KEVA J. MCDONALD, Fairfax, Virginia, for Appellee.  **ON BRIEF:** Dana J. Boente, United States Attorney, Stephen M. Campbell, Tobias D. Tobler, Assistant United States Attorneys, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellant.  Frank Salvato, SALVATO LAW, Alexandria, Virginia, for Appellee.

———————

AGEE, Circuit Judge:

Pursuant to 18 U.S.C. § 5032, the Government filed a motion to transfer the Defendant -- who was a juvenile at the time of the alleged offense -- for prosecution as an adult for murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1).[1] This crime carries a mandatory statutory penalty of either death or life imprisonment. The district court denied the Government's motion after concluding that the prosecution would be unconstitutional given that recent Supreme Court decisions have held that the United States Constitution prohibits sentencing juvenile offenders to either of these punishments. See Miller v. Alabama, 132 S. Ct. 2455 (2012) (mandatory life imprisonment); Roper v. Simmons, 543 U.S. 551 (2005) (death penalty).

The Government appeals the district court's decision, contending that its transfer motion should have been granted because the Defendant could have been sentenced to a term of years up to a discretionary life sentence. For the reasons set forth below, we affirm the district court's decision.

---

[1] Federal law prohibits the public release of a juvenile's name in association with these proceedings. 18 U.S.C. § 5038(e). Accordingly, we use the designation "Defendant" throughout this opinion.

I.

A.

Although the constitutionality of the juvenile transfer provisions are not at issue in this case, they form the backdrop for our discussion. The Juvenile Justice and Delinquency Prevention Act ("the Act"), 18 U.S.C. § 5031 et seq., was adopted to "remove juveniles from the ordinary criminal process in order to avoid the stigma of a prior criminal conviction and to encourage treatment and rehabilitation." United States v. Robinson, 404 F.3d 850, 858 (4th Cir. 2005).[2] The Act establishes procedures for handling criminal charges brought against juveniles in federal court. United States v. Juvenile Male, 554 F.3d 456, 459 (4th Cir. 2009). To initiate a proceeding under the Act, the Government files a delinquency information rather than a criminal indictment. Id. at 460.

In relevant part, the Act permits juveniles 15 years or older to be transferred from juvenile status for prosecution as an adult if they are alleged to have committed certain violent crimes, including murder. 18 U.S.C. § 5032. The district court has authority to grant the transfer to adult status if, after a hearing, it finds by a preponderance of the evidence that

_____

[2] Unless otherwise indicated, all internal quotation marks, citations, or alterations have been omitted in this and subsequent citations.

"transfer would be in the interest of justice." Id. The statute delineates six factors for the court to consider in this inquiry, including the age and social background of the juvenile, the nature of the alleged offense, and the juvenile's prior delinquency record. Id.[3]

B.

When he was a few months shy of his eighteenth birthday, the Defendant allegedly participated in a gang-related murder. The Government filed a delinquency information and certification against the Defendant pursuant to 18 U.S.C. § 5032 and simultaneously moved to transfer him for prosecution as an adult for murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1).

The Defendant opposed the motion, arguing that transfer would be unconstitutional given the Supreme Court's decisions holding that juvenile offenders could not be sentenced to either death or mandatory life imprisonment, which are the only penalties authorized in § 1959(a)(1) for murder in aid of

_____

[3] In cases where a juvenile is alleged to have committed an offense that would render him eligible for transfer after having already been convicted of a prior qualifying crime, the district court does not engage in the "interest of justice" analysis, but instead is instructed to transfer the juvenile "to the appropriate district court of the United States for criminal prosecution." 18 U.S.C. § 5032.

By its terms, this provision does not apply to the Defendant because he has no prior qualifying conviction.

4

racketeering. Separately, he also contested whether transfer was in the "interest of justice" under the § 5032 factors.

The district court concluded that although the interest-of-justice factors supported transfer, it would be unconstitutional to grant the Government's motion. This was so, it explained, because district courts do not have discretion to sentence a defendant to less than the statutory mandatory minimum penalty, which, for violating § 1959(a)(1), is life imprisonment. It recognized that under the Supreme Court's decision in Miller v. Alabama, 132 S. Ct. 2455 (2012), imposing a mandatory life sentence on a juvenile, like the Defendant, is constitutionally prohibited. The district court further observed that no authority permitted it to impose a sentence lower than the mandatory minimum provided by the statute. In so doing, it rejected the Government's argument that § 1959(a)(1) could be excised to permit a sentence of a term of years for a juvenile offender.

The Government noted a timely appeal, and we have jurisdiction to consider this interlocutory appeal under the collateral order doctrine. See United States v. Smith, 851 F.2d 706, 708 (4th Cir. 1988); see also United States v. Leon, 132 F.3d 583, 588-89 (10th Cir. 1997).

5

The parties agree that the Supreme Court's recent decisions prohibit a straight-forward transfer, prosecution, and sentencing of a juvenile under the terms of the federal murder in aid of racketeering statute. This is so because over the past eleven years the Supreme Court has issued several decisions affecting the constitutional boundaries of sentences imposed on offenders who were juveniles when their crimes were committed. Montgomery, Slip Op. 1.

In Roper v. Simmons, 543 U.S. 551 (2005), the Supreme Court held that the Constitution's guarantee against cruel and unusual punishment prohibited juvenile offenders from being sentenced to death. Id. at 578 ("The Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed."). In Graham v. Florida, 560 U.S. 48 (2010), the Supreme Court held that the Constitution also prohibits juvenile offenders convicted of nonhomicide offenses from being sentenced to life imprisonment without parole. Id. at 82.[4] The Supreme Court concluded in Miller that the Constitution prohibits juvenile offenders who

_____

[4] A "life sentence" in the federal sentencing scheme is the same as "life without possibility of parole" because the federal government has abolished parole. See Richmond v. Polk, 375 F.3d 309, 316 (4th Cir. 2004).

6

commit murder from being sentenced to mandatory life without parole. 132 S. Ct. at 2460. And, most recently, in Montgomery v. Louisiana, 577 U.S. ___ (2016), the Supreme Court clarified that Miller contained both a substantive and procedural component:

> Because Miller determined that sentencing a child to life without parole is excessive for all but the rare juvenile offender whose crime reflects irreparable corruption, it rendered life without parole an unconstitutional penalty for a class of defendants because of their status—that is, juvenile offenders whose crimes reflect the transient immaturity of youth.
>
> . . . . Miller, it is true, did not bar a punishment for all juvenile offenders, as the Court did in Roper[, but it] did bar life without parole . . . for all but the rarest of juvenile offenders[.]
>
> To be sure, Miller's holding [also] has a procedural component. Miller requires a sentence to consider a juvenile offender's youth and attendant characteristics before determining that life without parole is a proportionate sentence. . . .

Slip Op. 17-18.

It is in the context of the foregoing decisions that we examine the statute under which the Government seeks to prosecute the Defendant: murder in aid of racketeering. This offense is included in the federal violent crimes in aid of racketeering activity statute, which provides, in relevant part:

7

> (a) Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished--
>
> (1) for murder, by death or life imprisonment, or a fine under this title, or both; and for kidnapping, by imprisonment for any term of years or for life, or a fine under this title, or both . . . .

18 U.S.C. § 1959(a).

Under the plain language of § 1959(a)(1), Congress has authorized two penalties – and only two penalties – for the crime of murder in aid of racketeering: "death or life imprisonment."[5] Further, we note that a district court

---

[5] As § 1959(a)(1) reflects, a person convicted of murder in aid of racketeering is also subject to a fine. However, we do not believe Congress intended a fine to be a stand-alone penalty for committing this offense. Rather, we agree with the Second Circuit's analysis in United States v. James, 239 F.3d 120 (2d Cir. 2000), which observed that it would be "deeply problematic" for Congress to have authorized a penalty of a fine only as an alternative to "death or life imprisonment," and that this cannot have been what Congress intended. As such, the better construction of this statute is that it authorizes a fine in addition to either "death or life imprisonment." Id. at 126-27; see also United States v. Mahadi, 598 F.3d 883, 897 n.13 (D.C. Cir. 2010) (reaching this same "common sense conclusion"). (Continued)

8

ordinarily has "no discretion to impose a sentence outside the statutory range established by Congress for the offense of conviction." United States v. Robinson, 404 F.3d 850, 862 (4th Cir. 2005).[6] Consequently, life imprisonment is the mandatory minimum punishment for this offense. See James, 239 F.3d at 127.

But, as reflected above, Miller and Roper have prohibited juveniles from being sentenced to either of the congressionally authorized punishments for murder in aid of racketeering. Thus, the crux of the case before us is whether a judicial remedy exists that would nonetheless allow juveniles to be prosecuted for this offense, yet subjected to a punishment different from that enacted by Congress.

B.

The Government contends that the district court should have permitted transfer because if the Defendant is convicted of violating § 1959(a)(1), the district court could sentence him to

---

Although the Supreme Court's recent juvenile sentencing decisions did not impact the continued vitality of the authorized punishment of a fine in § 1959(a)(1), the Government – for obvious reasons – does not want to prosecute the Defendant for this offense only to subject him to a fine. Nor would a fine-only offense fit logically within the structure Congress enacted in § 1959(a) as a whole.

[6] A district court is authorized to impose a sentence below the statutory minimum in two circumstances unrelated to the issues before us in this case. See 18 U.S.C. § 3553(e).

a term of years up to a maximum of life imprisonment. Although we review the decision to deny a motion to transfer for abuse of discretion, we review de novo the district court's statutory and constitutional rulings relating to the transfer. Juvenile Male, 554 F.3d at 465.[7]

In support of its argument, the Government relies on the principle that unconstitutional portions of a statute can be "severed or excised so that the remaining constitutional portions may be applied." Opening Br. 12. The Government contends that the impermissible punishments can be excised from § 1959(a)(1), leaving intact language contained later in that subsection for the separate criminal act of kidnapping in aid of racketeering, which authorizes a term of years up to a discretionary maximum sentence of life. Specifically, the Government urges the following excision of the sentencing portion of the statute as applied to juvenile offenders:

> [Violators] shall be punished--
>   (1) for murder, ~~by death or life imprisonment, or a fine under this title, or both;~~ and for kidnapping, by imprisonment for any term of years or for life, or a fine under this title, or both; . . . .

§ 1959(a). The Government argues that this reconstruction of the statute recognizes that Congress would rather have a

---

[7] The Defendant did not file a cross-appeal challenging the district court's analysis and conclusion that the interest-of-justice factors would otherwise support transfer. As such, that issue is not before us.

constitutional penalty provision of this sort than have the entire penalty provision declared inapplicable to the worst juvenile offenders. Additionally, the Government maintains that this approach is consistent with how other courts have proceeded in light of Miller.

When a court determines that a statute contains unconstitutional provisions, it will "try to limit the solution to the problem" by considering, for example, whether it is possible "to sever its problematic portions while leaving the remainder intact." Ayotte v. Planned Parenthood of. N. New England, 546 U.S. 320, 328-29 (2006). But in Roper and Miller, the Supreme Court's rulings affected multiple state and federal statutes and the Court did not proceed to this next step of a possible severability remedy. Some state legislatures have since enacted statutes aimed at rectifying their problematic sentencing provisions created by these decisions. E.g., 2014 Fla. Laws 220, 2014 Mich. Pub. Acts 22, 2013 Cal. Stat. ch. 312.[8] Congress, however, has taken no action to alleviate the sentencing conundrum now existing in § 1959(a)(1) as applied to juveniles. Moreover, the specific issue before us appears to be

---

[8] These legislative fixes vary, but can be broadly put into three categories: (1) adopting Miller-compliant procedural protections during the sentencing of juveniles; (2) enacting a new penalty scheme for juveniles; and/or (3) authorizing parole after a fixed period of a mandatory life sentence.

one of first impression in the federal courts: that is, no case has arisen where the criminal act charged against a juvenile is alleged to have been committed after Miller was decided. See infra Section II.D. Accordingly, we must determine how the Supreme Court's decisions affect the Government's ability to prosecute juveniles for murder in aid of racketeering in the absence of congressional action.

C.

1.

"Severance is a tool for preserving the current statute, and it flows from the principle that invalidating a whole statute may nullify more of the work of the people's elected representatives than is constitutionally necessary." Covenant Media of S.C., LLC v. City of N. Charleston, 493 F.3d 421, 438 (4th Cir. 2007); see also Pittston Co. v. United States, 368 F.3d 385, 400 (4th Cir. 2004) ("[W]hen an application of a statute is determined to be unconstitutional, courts seek to preserve as much of the statute as is still consistent with legislative intent . . . . Whenever an act of Congress contains unobjectionable provisions separable from those found to be unconstitutional, it is the duty of this court to so declare, and to maintain the act in so far as it is valid.").

The Supreme Court has articulated the "well established" "standard for determining severability" as follows:

> Unless it is evident that the Legislature
> would not have enacted those provisions
> which are within its power, independently of
> that which is not, the invalid part may be
> dropped if what is left is fully operative
> as a law.

Alaska Airlines, Inc. v. Brock, 480 U.S. 678, 684 (1987). As this standard reflects, severance only works "if the balance of the legislation [can] function[] independently." Id.; see also Free Enter. Fund v. Pub. Co. Accounting Oversight Bd., 561 U.S. 477, 508 (2010) (holding that the statute remained "fully operative as a law" following excision of unconstitutional provisions, so excision was permitted so long as continued enforceability of the excised statute would be consistent with congressional intent). But where the "balance of the legislation is incapable of functioning independently," then severance is not a viable option. Alaska Airlines, 480 U.S. at 685.

2.

Articulating a crime and providing a penalty for its commission are indelibly linked. As the Supreme Court has observed,

> [t]he defendant's ability to predict with
> certainty the judgment from the face of the
> felony indictment [historically] flowed from
> the invariable linkage of punishment with
> crime. See 4 Blackstone 369-370 (after
> verdict, and barring a defect in the
> indictment, pardon or benefit of clergy,
> "the court must pronounce that judgment,

13

> which the law hath annexed to the crime"
> (emphasis added)).

*Apprendi v. New Jersey*, 530 U.S. 466, 478-79 (2000).  Indeed, the defining characteristic of a criminal statute is its punitive effect.  See *Smith v. Doe*, 538 U.S. 84, 92 (2003) (describing the process of determining whether a statute should be characterized as criminal or civil by looking to whether the legislature intended to impose punishment, and if not, then whether its scheme is nonetheless "so punitive either in purpose or effect as to negate the State's intention to deem it civil"); see also *Black's Law Dictionary* 1634 (10th ed.) (defining "penal statute" as "[a] statute by which punishments are imposed for transgressions of the law").

Given this inherent connection between the crime and its stated punishment, the Supreme Court has affirmed the dismissal of an indictment charging a violation of an offense for which the statute provided no corresponding penalty.  *United States v. Evans*, 333 U.S. 483, 495 (1948).  In that case, the Court noted that while the statute articulated multiple crimes, the penalty provision was limited by its plain terms to only certain offenses.  *Id.* at 484.  Consequently, it held that the statute was "unenforceable for [those] offenses" where no punishment existed.  *Id.* at 495; see also *id.* at 486 ("[W]here Congress has exhibited clearly the purpose to proscribe conduct within its

14

power to make criminal <u>and has not altogether omitted provision for penalty</u>, every reasonable presumption attached to the proscription to require the courts to make it effective in accord with the evident purpose." (emphasis added)). In short, a criminal statute is not operative without articulating a punishment for the proscribed conduct.

As enacted, § 1959(a)(1) functions without interpretive difficulty in the sentencing of adult defendants: a person convicted for murder in aid of racketeering "shall be punished" "by death or life imprisonment, or a fine under this title, or both[.]" <u>Id.</u> But once these unconstitutional punishments for murder in aid of racketeering are removed for purposes of prosecuting juveniles, as the Government now asks, no applicable penalty provision remains.[9] Thus, while excising the penalty provisions may cure the problem created by <u>Miller</u> and <u>Roper</u>, it simultaneously creates a vacuum that renders the statute unenforceable as pertaining to juveniles because what would remain of the statute is "incapable of functioning independently." <u>Alaska Airlines</u>, 480 U.S. at 684.

3.

Nonetheless, the Government posits that the structure of § 1959(a)(1), which includes separate punishment provisions for

_____

[9] We do not include the § 1959(a)(1) fine in our consideration for the reasons already discussed.

15

murder and kidnapping, could be reconstructed by making the penalty for the act of kidnapping applicable to the act of murder. The Government's proposal contravenes the principles governing both severance and due process.

At the outset, we observe that § 1959(a) prohibits committing (or attempting or conspiring to commit) several violent crimes in aid of racketeering. See United States v. Fiel, 35 F.3d 997, 1003 (4th Cir. 1994). The statute's punishment provisions are each articulated in terms of the underlying violent crime. Subsection (1) sets the punishments for two of those underlying violent crimes: murder and kidnapping.

Substituting the congressionally designated punishment for one distinct act for that articulated for another, separate act goes beyond the permissible boundaries of severance and treads into the legislative role. See Ayotte, 546 U.S. at 329 (cautioning that courts cannot rewrite statutes in the name of severance in order "to conform [them] to constitutional requirements"). Legislatures, not courts, are charged with articulating the authorized penalties for criminal conduct. See Harris v. United States, 536 U.S. 545, 557 (2002) (explaining that defining criminal conduct, including its appropriate punishment, is "a task generally left to the legislative branch"); Mistretta v. United States, 488 U.S. 361, 364 (1989)

16

("Congress, of course, has the power to fix the sentence for a federal crime, and the scope of judicial discretion with respect to a sentence is subject to congressional control."). Only when Congress has articulated the penalties authorized by law for a criminal act does the judiciary's work begin. E.g., Williams v. New York, 337 U.S. 241, 247 (1949) (noting that a sentencing judge's broad discretion to impose a sentence is limited by the "fixed statutory or constitutional limits [regarding] the type and extent of punishment after the issue of guilt" has been resolved).

To demonstrate why the Government's proposal in this case differs from an appropriate remedy of severance and excision, and instead usurps the constitutional allocation of the power to write a statute to Congress, consider the following illustration. After Roper, but before Miller, the Supreme Court had only declared that it was unconstitutional to sentence juveniles to death and left intact the constitutionality of lesser sentences. At that point in time, a juvenile such as the Defendant could not have been sentenced to death, but could (and must) have been sentenced to mandatory life imprisonment. Thus, post-Roper, the murder in aid of racketeering statute effectively could have been excised to read:

17

> [Violators] shall be punished--
>
> (1) for murder, by ~~death or~~ life imprisonment, or a fine under this title, or both; and for kidnapping, by imprisonment for any term of years or for life, or a fine under this title, or both . . . .

18 U.S.C. § 1959(a)(1). In looking at the severance remedy of excising the unconstitutional death penalty provision, an acceptable punishment that Congress had specifically authorized remained intact: mandatory life imprisonment. And because "the balance of the legislation [could] function[] independently," excising the unconstitutional death penalty provision and enforcing the remainder would have been an appropriate judicial action. Alaska Airlines, 480 U.S. at 685.

But what the Government proposes here post-Miller is altogether different: using excision to combine the penalty provisions for two distinct criminal acts. The serendipitous juxtaposition of the two separate criminal acts (murder and kidnapping) within one subsection of § 1959(a) does not make the Government's proposal any less of an impermissible judicial rewriting of one offense's penalty provision.[10] The penalty

---

[10] To illustrate this point, suppose the statutory maximum for kidnapping in aid of racketeering was not discretionary life imprisonment, but rather five years' imprisonment. The Government could not credibly argue that the five-year kidnapping maximum should be applied to murder in aid of racketeering by a juvenile under the auspices of being a mere excision within the same statutory subsection. Yet upon the (Continued)

18

enacted for the kidnapping-based offense cannot simply be interchanged with and applied to the murder-based offense, as these are two wholly separate means of violating § 1959 with distinct elements. See United States v. Umaña, 750 F.3d 320, 334-35 (4th Cir. 2014).[11]

Under the guise of severance principles, the Government seeks to have the judiciary create in the first instance an appropriate punishment now that the Supreme Court has ruled the only penalties Congress chose for the crime are unconstitutional as applied to juveniles. Accepting the Government's invitation would be "nothing less than judicial legislation pure and

---

excision of text contemplated by the Government's severance analysis, that is the result that would necessarily follow.

[11] To establish a claim under § 1959(a), the government must prove the following elements:

    (1) that there was an enterprise engaged in racketeering activity;

    (2) that the enterprise's activities affected interstate commerce;

    (3) that the defendant committed the alleged crime of violence; and

    (4) that the defendant, in committing the alleged crime of violence, acted in response to payment or a promise of payment by the enterprise or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise.

Umaña, 750 F.3d at 334-35. Obviously, to establish a murder-based offense, the Government's proof as to the third and fourth elements must demonstrate that the defendant committed a murder, while to establish a kidnapping-based offense, the Government's proof must relate to kidnapping. See id.

19

simple." Ballard v. Miss. Cotton Oil Co., 34 So. 533, 554 (Miss. 1903).

4.

We also observe that the Government's reliance on United States v. Booker, 543 U.S. 220 (2005), overstates a court's goal of looking to what Congress would have preferred in remedying the problem of unconstitutional provisions through severance. Booker expressly disclaimed "creat[ing] a new kind of severability analysis," id. at 247, and applied the well-established inquiry we described earlier. Id. at 246, 248-49. That inquiry looks to legislative intent in determining whether unconstitutional provisions can be severed from constitutional ones, and leaves in place "valid provisions of an act . . . unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not." Pittston Co. v. United States, 368 F.3d 385, 400 (4th Cir. 2004); see also Ayotte, 546 U.S. at 330 (reiterating that "a court cannot use its remedial powers to circumvent the intent of the legislature"). But nothing in Booker allows this Court to replace excised language from one provision with language not previously applicable to it from a separate provision. See Ayotte, 546 U.S. at 329 (observing, post-Booker, that when considering whether severability is an appropriate remedy, courts must "restrain [them]selves from

20

rewriting [the] law to conform it to constitutional requirements even as we strive to salvage it").[12]

Looking to legislative intent to remedy a constitutional defect is of limited utility when there is no indication what that legislative intent would be under the circumstances. See Booker, 543 U.S. at 246. In the absence of language in the murder in aid of racketeering penalty provision itself that could authorize a term of less than life imprisonment, we cannot fill a void in the statutory language by looking to other offenses.[13]

---

[12] The Government states that the excision it proposes is similar to the excision the Supreme Court made in Booker when it excised provisions setting out the standard of review on appeal because they cross-referenced the unconstitutional provisions making the sentencing guidelines mandatory. See Reply Br. 4. In Booker, the Supreme Court held that the absence of articulated standards of review posed no problem because the "appropriate review standards [could be inferred] from related statutory language, the structure of the statute, and the sound administration of justice." 543 U.S. at 260-61.

The Government overlooks the Booker opinion's recognition immediately prior to that statement that the excision of the standard-of-review provisions did "not pose a critical problem for the handling of appeals . . . because, as we have previously held, a statute that does not explicitly set forth a standard of review may nonetheless do so implicitly." Id. at 260.

In contrast, the excision of a criminal offense's penalty provision does "pose a critical problem" and courts have no authority to implicitly decide an appropriate punishment range in the first instance.

[13] The Government contends that Congress would obviously cap a juvenile's sentencing exposure for murder in aid of racketeering at life imprisonment. However, in light of Roper, Miller, and Montgomery, juvenile sentencing is undergoing substantive changes. We have no way of knowing how Congress (Continued)

21

Grafting a newly applicable penalty provision into the murder in aid of racketeering statute, as the Government proposes, also runs counter to the Constitution's guarantee of due process. "Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." BMW of N. Am. v. Gore, 517 U.S. 559, 574 (1996); see United States v. Batchelder, 442 U.S. 114, 123 (1979) (observing that "vague sentencing provisions may pose constitutional questions if they do not state with sufficient clarity the consequences of violating a given criminal statute").[14]

---

would or will act and would be engaging in pure speculation in guessing what that result might be. Despite having four years to act since being alerted by Miller to the constitutional problem posed by statutes that have a mandatory minimum of life imprisonment, Congress has failed to address the matter. It is their place under the Constitution's separation of powers to do so, not ours. See Evans, 333 U.S. at 495 (observing that manipulating a statute to fill in a missing penalty provision "is a task outside the bounds of judicial interpretation").

[14] Citing Peugh v. United States, 133 S. Ct. 2072 (2013), the Defendant argues that prosecuting him for murder in aid of racketeering with a judicially created penalty would violate the Constitution's prohibition against ex post facto laws. This argument is misplaced as the plain language of the Constitution limits its application to legislative acts: "No . . . ex post facto Law shall be passed." U.S. Const. art. I, § 9, cl. 3 (Continued)

Our concerns about lack of notice arise from the Government urging us to look outside the express language of the stated offense for an acceptable alternative penalty. When the crime at issue in this case occurred, Congress unambiguously informed individuals that murder in aid of racketeering was punishable by death or mandatory life imprisonment. Congress provided for no other penalty. However, a juvenile like the Defendant could not be sentenced to either of those punishments after Miller. Nor would that juvenile have notice at the time of the alleged crime that he could be subject to any other punishment, such as imprisonment to a term of years. And, more precisely for the Government's proposal, a juvenile had no notice at the time of the alleged crime that the punishment provided for a different offense (kidnapping in aid of racketeering) might now be

---

(limiting acts of Congress). We are not dealing with a law Congress enacted here, but with the court's interpretation of those laws. As such, the Ex Post Facto Clause is not at issue. See Rogers v. Tennessee, 532 U.S. 451, 460 (2001).

To the extent this case raises problems with notice and warning, they fall within the ambit of the Due Process Clause. Id. at 459 (observing that prior cases addressing the ex post facto consequences of judicial actions have "rested on core due process concepts of notice, foreseeability, and . . . the right to fair warning"); cf. Peugh, 133 S. Ct. at 2085 (observing that, in part, the Ex Post Facto Clause "ensures that individuals have fair warning of applicable laws").

23

applicable to him through the court's use of severability principles.[15]

The Government argues that juveniles such as the Defendant had adequate notice of their potential maximum punishment – life imprisonment – based on the existing statutory language, and that Miller simply required a court to consider certain factors before imposing that maximum sentence. We disagree. The only authorized statutory punishment was mandatory life imprisonment, not an indeterminate punishment capped at life imprisonment. That the authorized penalty for murder in aid of racketeering is greater than the Government's proposed alternate penalty may lessen, but does not obviate, the concern as to notice. If the "[d]eprivation of the right to fair warning . . . can result . . . from an unforeseeable and retroactive judicial expansion of statutory language that appears narrow and precise on its face," Rogers, 532 U.S. at 457, then surely it can also come from an unforeseeable and retroactive judicial severability analysis that would result in excising an offense's penalty provision so that the penalty for another offense would now apply.

---

[15] As is often the circumstance when it comes to notice of criminal penalties, the Court must consider the legal fiction that a criminal will carefully consider the text of the law before he breaks it. See McBoyle v. United States, 283 U.S. 25, 27 (1931).

24

The Government also points to various cases where juvenile offenders convicted under a statute requiring life imprisonment prior to Miller have subsequently been sentenced or resentenced to a term of years or a discretionary life sentence. For example, the Government cites United States v. Maldonado, No. 09 Cr. 339-02, 2012 WL 5878673 (S.D.N.Y. Nov. 21, 2012), aff'd sub nom. United States v. Guerrero, 560 F. App'x 110 (2d Cir. 2014), a district court decision in which the juvenile offender had been convicted prior to Miller for two offenses that carried mandatory terms of life imprisonment. Id. at *9. At the defendant's post-Miller sentencing hearing, the district court observed that a mandatory life sentence could no longer be imposed, and then proceeded to analyze the factors outlined in Miller. The court concluded those factors supported life imprisonment and imposed that sentence. Id. at *9-11.

This case does not offer persuasive support for the proposition that for a crime committed after Miller, the Government can initiate a prosecution against a juvenile for an offense when its only articulated penalties are prohibited. As an initial matter, it does not appear that the parties in Maldonado raised the arguments presented here. Maldonado does not involve a defendant whose alleged criminal conduct occurred after Miller, nor does it involve a prosecution that began after

25

Miller. This procedural difference also means that Maldonado did not give rise to the due process problems the instant case poses because at the time that Maldonado committed his crime and was prosecuted for it, the statute had a functioning penalty provision. Only later did any constitutional prohibition come to light.

The Government also cites to a handful of cases where federal courts have authorized the resentencing of juvenile offenders convicted and sentenced prior to Miller to support its position that sentencing courts can impose a term of years instead of mandatory life imprisonment. E.g., United States v. Bryant, 609 F. App'x 925, 927 (9th Cir. 2015); Pete v. United States, Nos. CV 13-8149-PCT-RCB (DKD), CR 03-0355-PCT-RCB, 2014 WL 88015, at *1-2 (D. Ariz. Jan. 9, 2014) (government conceded retroactive applicability and did not oppose defendant's § 2255 motion for resentencing, so district court ordered that relief in light of Miller requiring individualized sentencing for juvenile offenders). But these cases are distinguishable for the same reasons set forth above. Those courts were looking to how to remedy a mandatory life sentence that was validly imposed at the time, but which was subsequently determined to be unconstitutional. That presents a fundamentally different inquiry from the case before us.

Lastly, the Government asserts that the district court's rationale, coupled with the conclusion that Miller is retroactive, would require reversing countless convictions. The Supreme Court has already considered -- and rejected -- a similar suggestion in Montgomery. As noted, subsequent to oral argument in this case, the Supreme Court decided that Miller is indeed retroactively applicable on collateral review. See Montgomery, slip op. at 15-22. The Court in Montgomery was careful to note, however, that the problems arising from Miller's retroactivity could be remedied short of vacating convictions or requiring resentencing. Id. at 20-21. The limits of Montgomery will no doubt be litigated in future cases, but for present purposes it is sufficient to observe that the Supreme Court has indicated that vacating a conviction may not be necessary in order to remedy a past Miller violation. Id.

Whatever the appropriate remedies may be for those juvenile offenders who were convicted and sentenced prior to Miller, they stand on entirely different ground than the Defendant. This case only requires considering whether initiating prosecution of a juvenile for murder in aid of racketeering alleged to have occurred after Miller would be unconstitutional because the sentencing court could not constitutionally impose the only two authorized penalties for that offense. We hold that such a prosecution cannot constitutionally proceed.

27

III.

The Supreme Court's conclusion in <u>Evans</u> nearly seven decades ago aptly addresses the Government's argument for a judicial remedy in the case before us:

> This is a task outside the bounds of judicial interpretation. It is better for Congress, and more in accord with its function, to revise the statute than for us to guess at the revision it would make. That task it can do with precision. We could do no more than make speculation law.

333 U.S. at 495.

For that reason and as further explained above, we agree with the district court that the Defendant cannot be prosecuted for murder in aid of racketeering because his conviction would require the court to impose an unconstitutional sentence.[16] Therefore, the district court did not err in denying the Government's motion to transfer the Defendant for prosecution as an adult and its decision is affirmed.

<u>AFFIRMED</u>

---

[16] The Defendant acknowledges that other prosecutorial options may be available to the Government. For example, our holding does not prevent the Government from seeking the Defendant's transfer for prosecution as an adult for a different federal crime that would not violate the above principles, nor does it prohibit the Government from trying the Defendant as a juvenile for this offense, subject to the then-applicable sentencing provisions. Those options are solely in the Government's province to pursue and we offer no opinion in that regard.

28