**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 27, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

J.D.V., JR.,

    Defendant - Appellant.

No. 25-9900

_____

Before **McHUGH**, **MURPHY**, and **MORITZ**, Circuit Judges.

_____

**MORITZ**, Circuit Judge.

_____

When defendant, J.D.V., was 17 years and eight months old, he armed himself with a gun and stormed the home of his rivals, brothers Ethan Gentry and R.G. ("Peanut"). He shot and killed Ethan and shot and gravely injured Ethan and Peanut's sister and mother. He now faces ten charges, including murder in Indian country and murder in perpetration of burglary in Indian country. The government moved to transfer defendant from juvenile to adult proceedings under the Juvenile Justice and Delinquency Prevention Act, 18 U.S.C. §§ 5031–5043. After weighing the statutory factors that govern these transfers, the district court granted the motion to transfer.

In this interlocutory appeal, defendant argues that the district court abused its discretion in weighing four of the six factors. But defendant's arguments largely ask

this court to substitute its analysis for the district court's and reweigh the transfer factors—actions that our abuse-of-discretion standard doesn't permit. Defendant also argues that the Eighth Amendment prohibits transfer because the only punishments available for the murder charges—life in prison or death—are unconstitutional when applied to minors. He raises this argument for preservation purposes only and acknowledges that it is foreclosed by our recent precedent. We therefore affirm the district court's grant of the government's motion to transfer.

### Background[1]

During the spring of 2022, defendant feuded with his high-school classmate Peanut because Peanut had previously dated defendant's girlfriend. In March 2022, defendant began threatening Peanut, texting his girlfriend, "F[***] [P]eanut," R. vol. 2, 168, and "I got a plan to kill him," Supp. R. vol. 1, 118. Shortly thereafter, defendant was suspended from school for 25 days for punching Peanut.

On September 5, 2022, defendant was 17 years and eight months old. The events of that fateful day began with defendant posting a photo on Snapchat that insulted Peanut's mother's deceased partner. Peanut's brother, 18-year-old Ethan, took offense at defendant's post. Ethan messaged defendant and, after a lengthy war of words, the two agreed to fight. Defendant threatened, "[Y]'all gon be dead." Supp. R. vol. 1, 10. Ethan drove to defendant's home with four others: his girlfriend, his

---

[1] We draw our description from testimony and exhibits presented at the transfer hearing. "[I]n making the transfer decision, the court may assume the truth of the government's allegations regarding the defendant's commission of [the] charged crime." *United States v. Leon D.M.*, 132 F.3d 583, 589–90 (10th Cir. 1997).

older sister, a friend, and Peanut. Ethan's group expected a one-on-one fistfight between Ethan and defendant.

When Ethan's group arrived at defendant's home, defendant and his mother came out of the home with guns. No one in Ethan's group had a gun. Defendant's mother and Ethan's sister discussed the ground rules for the boys' fight. Defendant's mother suggested that Ethan's group go to a nearby convenience store. Ethan's group complied, but they left the convenience store after five to ten minutes, concerned that defendant or his mother had called the police. The group returned home. But the conflict was far from over.

Defendant demanded that Ethan return with fewer people in his group. In response, Ethan told defendant to come over and defendant agreed, telling Ethan, "We['re] coming[.] Don't leave." *Id.* at 95. Defendant then continued to message Ethan, insulting Peanut, Ethan, Ethan's girlfriend, and Ethan's mother's deceased partner.

Defendant arrived at Ethan and Peanut's home, accompanied by his father, his mother, his girlfriend, and his 11-year-old brother. Defendant's mother drove the group—who remained armed—in the family's truck and parked it behind a tree line near Ethan and Peanut's home. Ethan, Peanut, their mother, and others were outside when the group arrived. The group then came through the tree line with defendant's father leading the charge toward the house, yelling, "Who the f[***] here is 18? Who wanted to start shit? Who wants trouble now?" R. vol. 2, 314. Defendant's father tried to hit Ethan's mother, and Ethan tackled him. Defendant's mother joined the

3

fray, screaming, yelling, and firing her gun at Ethan's friend Jesus. Defendant's girlfriend, armed with a handheld stun gun, began fighting Ethan's girlfriend.

Defendant ran toward the house with a handgun, yelling at Ethan's family that they'd "f[***]ed up" and "were going to pay for what they did." R. vol. 2, 317. And he yelled, "I am going to f[***]ing kill you, Peanut." *Id.* He started shooting at Peanut, who ran into the house. Defendant followed, shooting and continuing to yell at Peanut that he was going to kill him. Five young children were inside, and Peanut ushered them into a back bedroom to hide under the bed. Peanut's mother and sister followed defendant. Defendant turned around and shot Peanut's sister three times, including once in the femur. She testified that defendant laughed at her after he shot her, and her injuries were so extensive that she was life-flighted to a hospital, where she woke up one week later.

As defendant exited the house, Peanut's mother confronted him in the doorway and tried to wrestle the gun away from him. Maintaining control of the gun, defendant continued firing and shot Peanut's mother through the collarbone at close range. Ethan witnessed this from the porch and yelled, "[Y]ou shot my f[***]ing mom." *Id.* at 192. Defendant then turned his gun on Ethan and shot him three times, killing him. Ethan's mother testified that defendant laughed after he shot Ethan. Defendant, his girlfriend, and his mother then ran back to the truck and fled. Defendant's mother later claimed that people in Ethan's group had tried to kill her family, and on social media after the incident, she called defendant a hero for his actions that day.

In a call from jail after the incident, defendant said, "I don't feel bad." Supp. R. vol. 4, Ex. 308, at 1:16–1:18. He went on, "It's Peanut's fault. I hope he blames himself [for] the rest of his life." *Id.* at 1:30–1:34. In another call, defendant's girlfriend asked defendant, "Did it make you feel different that you know you killed someone?" Supp. R. vol. 4, Ex. 312, at 00:04–00:08. Defendant responded, "No." *Id.* at 00:08–00:09. She asked again, "No, not at all?" *Id.* at 00:10–11. Defendant responded, "Not one bit. Like, I still feel the same. Like, nothing's even happened to me . . . . I feel normal, still. Like it didn't affect me at all." *Id.* at 00:11–00:29.

A juvenile information filed in October 2022 charged defendant with ten counts: murder in Indian country; murder in perpetration of burglary in Indian country; using, carrying, brandishing, and discharging a firearm during a crime of violence in violation of 18 U.S.C. § 924(c); causing the death of a person in the course of violating § 924(c); three counts of attempted murder in Indian country; and three counts of assault with a dangerous weapon in Indian country.[2] Defendant moved to dismiss the murder counts, arguing that the statute provides only two possible punishments—death and life in prison—both of which are unconstitutional when applied to minors. *See* 18 U.S.C. § 1111. The magistrate judge recommended that the district court deny the motion, and the district court did so, holding this challenge was not yet ripe under our decision in *United States v. Doe*, 58 F.4th 1148 (10th Cir. 2023).

---

[2] Defendant is an enrolled member of the Cherokee Nation, and the alleged crimes occurred within the Cherokee Nation Indian Reservation.

The government moved to transfer the juvenile proceedings to adult criminal prosecution, citing 18 U.S.C. § 5032. The district court referred the transfer motion to the magistrate judge, who conducted an evidentiary hearing. The hearing evidence provided background about defendant's home life and upbringing. Defendant had lived his entire life with his parents. When defendant was a year old, his parents were arrested for possession of marijuana with intent to distribute. Law enforcement found marijuana and guns in the home. Oklahoma's Department of Human Services (DHS) initiated a deprived-children action, asserting that defendant and his brother were "not receiving proper parental care" and there was "substance abuse in the home by the mom and dad." Supp. R. vol. 3, 143. DHS recommended that the children remain in the home with supervision. Defendant's parents completed the DHS plan, and the state ultimately dismissed the deprived-child case.

The hearing evidence also shed light on defendant's past behavior and his parents' response. Defendant had no juvenile criminal history, but he had been disciplined for fighting in school. The government's expert, forensic psychologist Shawn Roberson, testified that defendant's mother made excuses and blamed others for defendant's misbehavior. Indeed, after the crimes at issue here, defendant's mother called defendant a hero, blamed others for the violence, and claimed defendant was being mistreated by the justice system. In Roberson's view, "that was kind of a consistent theme with what you saw from when he was younger, an excuse . . . for behavior." R. vol. 2, 407.

6

Roberson also testified about defendant's mental health and personality. Roberson said that defendant has no severe mental illness, has never been diagnosed with an intellectual disability, and has an average IQ, but he underperformed in school. Defendant self-reported to Roberson that he had severe depression and anxiety, which Roberson believed was primarily caused by incarceration. Roberson also determined that defendant lacked remorse for his actions. As relevant here, Roberson's psychological tests scored defendant in the 22nd percentile for psychopathy and found a high probability that defendant had a substance-use disorder. Roberson further found that defendant posed a median risk for dangerousness, had low sophistication and maturity, and scored mid-range on treatment amenability. Despite these findings, in Roberson's view, the testing underestimated defendant's level of dangerousness. Using his clinical judgment, Roberson categorized defendant at a high level of dangerousness.

The defense expert, Stephen Grissom, agreed with Roberson that defendant has an average IQ. Grissom, however, found defendant posed a low risk for dangerousness and scored high on treatment amenability. Grissom also disagreed with Roberson about defendant's feelings of remorse. Defendant told Grissom he was sorry, his actions ruined his life and took someone else's, and he felt bad for his family. Grissom believed defendant was genuine.

An employee with the Bureau of Prisons (BOP) also testified at the hearing about the programs that BOP offers in juvenile facilities and adult facilities. She said that juvenile facilities are required to offer basic educational and vocational

7

programming; education in basic cognitive skills, gang awareness, and cultural awareness; substance-abuse education and counseling; counseling for mental-health issues; financial education; recreation; and religious programming. The BOP witness testified that adult facilities have similar programming and, because those facilities have more inmates, they have more educational and treatment programs. But on the other hand, she said that because juvenile facilities have fewer juveniles in custody, the facilities can better tailor their programming. And juvenile programs are mandatory for inmates.

After the hearing, the magistrate judge issued an order that recommended transferring defendant's case for adult proceedings. Defendant objected. The district court overruled defendant's objections and, after de novo review, affirmed and adopted the magistrate judge's findings and recommendation, thus ordering defendant's case transferred to adult proceedings.[3]

Defendant appeals the transfer ruling.[4]

### Analysis

We review a district-court order transferring a juvenile for adult prosecution for abuse of discretion. *Doe*, 58 F.4th at 1156. "A district court abuses its discretion in deciding whether to transfer a juvenile to adult status when it fails to make the

---

[3] Because the district court adopted the magistrate judge's findings, and for ease of reference, we refer to the incorporated report and recommendations as the district court's findings.

[4] We have jurisdiction over this interlocutory appeal under the collateral-order doctrine. *United States v. B.N.M.*, 107 F.4th 1152, 1167 (10th Cir. 2024).

required factual findings or when its factual findings are clearly erroneous." *Leon D.M.*, 132 F.3d at 590. We will not overturn a district court's transfer decision "simply because [we] might have reached a different conclusion had [we] considered the matter in the first instance." *Doe*, 58 F.4th at 1157.

We begin with the basic concepts of transfer. "Under 18 U.S.C. § 5032, juveniles over the age of fifteen may sometimes be transferred for adult prosecution." *B.N.M.*, 107 F.4th at 1159. But the Supreme Court has held that "children are constitutionally different from adults for purposes of sentencing" because they "have diminished culpability and greater prospects for reform." *Miller v. Alabama*, 567 U.S. 460, 471 (2012). As a result, "juveniles may only be tried as adults when the government establishes that prosecution as an adult is 'in the interest of justice,' as part of the federal juvenile[-]delinquency process." *Doe*, 58 F.4th at 1156 (quoting *Leon D.M.*, 132 F.3d at 589). "[T]rying a juvenile as an adult is the exception rather than the rule: 'juvenile adjudication is presumed appropriate.'" *B.N.M.*, 107 F.4th at 1159 (cleaned up) (quoting *United States v. McQuade Q.*, 403 F.3d 717, 719 (10th Cir. 2005)). "Because a transfer hearing results only in an adjudication of status, the government's burden of proof is merely a preponderance of the evidence." *Id.* (quoting 9B Barbara Van Arsdale, et al., Federal Procedure, Lawyer's Edition § 22:2510 (updated June 2024)).

Congress has provided "six statutory factors to guide district courts in determining whether a transfer to adult status would be in the 'interest of justice.'" *Id.* at 1160 (quoting § 5032). Those six factors are:

9

(1) "the age and social background of the juvenile;"

(2) "the nature of the alleged offense;"

(3) "the extent and nature of the juvenile's prior delinquency record;"

(4) "the juvenile's present intellectual development and psychological maturity;"

(5) "the nature of past treatment efforts and the juvenile's response to such efforts;" and

(6) "the availability of programs designed to treat the juvenile's behavioral problems."

§ 5032.

Weighing these factors is not an exact science. The government must present evidence on each factor, and the district court must consider each factor. *B.N.M.*, 107 F.4th at 1160. But the district court need not "state whether each specific factor weighs in favor of or against transfer." *Id.* Nor must the district court "give equal weight to each factor"; instead, it "may balance the factors as it deems appropriate." *Doe*, 58 F.4th at 1157. To do that balancing, on the one hand, the district court must consider the goal of juvenile adjudication: "remov[ing] juveniles from the ordinary criminal process in order to avoid the stigma of a prior criminal conviction and to encourage treatment and rehabilitation." *McQuade Q.*, 403 F.3d at 719 (quoting *United States v. Anthony Y.*, 172 F.3d 1249, 1251–52 (10th Cir. 1999)). On the other hand, the district court must weigh "the need to protect the public from dangerous individuals." *Id.*

10

Here, although the district court wasn't required to state whether each factor weighed in favor of or against transfer, it balanced the factors as shown in the following chart and ultimately concluded that the factors favored transfer.



R. vol. 1, 563–65.

On appeal, defendant notably fails to challenge the conclusion that the nature of the alleged offense weighs heavily in favor of transfer. But he challenges the district court's analysis of four other factors: age and social background; present intellectual development and psychological maturity; nature of past treatment efforts; and availability of programs. Defendant also argues that the Eighth Amendment prohibits transfer because the only punishments available for the murder charges—life in prison or death—are unconstitutional when applied to minors.

We consider each point below.

## I.    Age and Social Background

The district court concluded that defendant's age and social background "weigh[] *strongly* in favor of transfer." R. vol. 1, 563. Defendant's arguments on this front focus exclusively on social background. Defendant does not challenge—nor could he—the district court's findings on his age: he was only four months shy of 18 years old at the time he committed the crime. By proffering no challenge on this front, defendant all but concedes that the district court did not err in weighing a critical aspect of this factor strongly in favor of transfer.

That omission aside, defendant argues the district court failed to sufficiently consider the effect of his social background—especially his parents' impact. Defendant asserts that his parents directed and encouraged his involvement in the crime at issue, and he maintains that he "has potential for rehabilitation if separated from his parents' harmful influence." Aplt. Br. 21. Defendant also cites the deprived-child state action from his infancy as evidence that his parents exposed him to harmful behavior. In his view, the district court clearly erred because it failed to acknowledge his parents' role in the crime, that he "will be separated from his parents when he is in a juvenile treatment facility[,] and that he will mature with age." *Id.* at 23.

To be sure, this case presents the uncommon circumstance in which the juvenile's parents directly participated in their child's crime. Nevertheless, the district court considered evidence about defendant's parents' role in the crime and in his upbringing. The court recounted in detail the events of the shooting and

defendant's parents' role in the shooting. And although the district court recognized the deprived-child state action, it found that defendant's life with his parents was "technically" "stable." R. vol. 1, 514. The court further noted that although defendant's parents were supportive, they kept guns in the home, "which contributed to the violent atmosphere giving rise to the events for which [d]efendant is charged." *Id.* at 515–16. The court also pointed out that defendant's parents use cannabis chronically.

The district court did not abuse its discretion by finding that this factor weighed in favor of transfer, and our caselaw supports its treatment of this factor. In *McQuade Q.*, the defendant had "an unfortunate background" with no parental support from his mother and "a bad adult example" from his father, which resulted in the defendant's "severe psychological problems." 403 F.3d at 720 (cleaned up). The *McQuade Q.* district court nevertheless concluded the factors favored transfer, and we affirmed. *Id.* Likewise, in *Anthony Y.*, the district court found that the defendant had an "unstable and unsupportive" family background and weighed this factor in favor of transfer. 172 F.3d at 1254 (cleaned up). Again, we affirmed. *Id.*

In sum, the district court did not abuse its discretion in rejecting defendant's view of the evidence and weighing this evidence in favor of transfer. We will not "reverse adequately supported findings simply because the evidence is subject to multiple interpretations."[5] *Id.*

---

[5] Also relevant to defendant's social background, defendant claims that the district court erred in finding that he uses cannabis on a chronic basis. The district

## II. Intellectual Development and Psychological Maturity

Defendant next argues that the district court abused its discretion in evaluating his present intellectual development and psychological maturity. Despite the plethora of psychological-testing evidence in the record, "the proper measure of intellectual development and psychological maturity is open to debate, and neither § 5032 nor the case[]law interpreting it specifies how these characteristics should be assessed in a particular juvenile." *Leon D.M.*, 132 F.3d at 590. Because of this lack of specificity, § 5032 "vests considerable discretion in the district court to decide, based on the evidence presented to it, whether a particular behavior . . . reflects intellectual development and psychological maturity or a lack of these characteristics." *Id.* at 591.

The district court found that this factor weighed moderately in favor of transfer. After reviewing the experts' testing and reports, the court concluded that defendant has average intelligence, low sophistication, and low maturity. Given these characteristics, the district court found that "[d]efendant has the cognitive ability to conform his conduct to the law and deliberately chose not to do so." R. vol. 1, 523. The court recognized defendant's parents' involvement in the crime, but it emphasized the lack of any evidence that defendant's parents provided him with the

---

court noted that defendant's chronic cannabis use "inhibits maturation." R. vol. 1, 563. Defendant claims that the district court overlooked that he has not used cannabis since his incarceration. But, even if defendant no longer uses cannabis, it is not unreasonable to conclude that his chronic cannabis use has "stifle[d his] development and maturity" and will inevitably affect his treatment. R. vol. 2, 408. And so this one sentence from the district court's order doesn't rise to the level of clear error.

14

gun, forced him to ride to Ethan and Peanut's home, or forced him to attack an unarmed family.

Defendant claims several errors. He first argues that the district court ignored the influence of his parents and "vastly understated [his] ability to refuse to participate in his parent's plans for violence that day." Aplt. Br. 26. But the record reveals that defendant's parents were not the only ones planning violence that day; rather, defendant instigated the incident by insulting members of Ethan and Peanut's family and trading threats and invitations to fight with Ethan on Snapchat. And as the district court found, there's no evidence that defendant's parents provided him with the gun he used in the attack. Nor is there any evidence that defendant's parents forced him to participate. Defendant's argument merely asks us to reweigh the evidence—rather than pointing to any clear error in these findings—and our standard of review does not allow this.

Defendant next argues that the district court "overstated [his] ability to predict and understand the consequences of his behavior" because his social immaturity and harmful parental influence made him unable to appreciate the wrongful nature of his actions. Aplt. Br. 27. In support, defendant relies on Grissom's determination that defendant is "emotionally overcontrolled, depressed, and dependent." R. vol. 2, 486. Defendant again asserts—without citation to the record—that his parents compelled his participation and that it was a "natural reaction . . . to defend his family and join the fight." Aplt. Br. 27.

15

We are not persuaded that the district court ignored defendant's impressionability. The court considered all the relevant psychological tests, including Grissom's findings. And, as already mentioned, the district court found no evidence that defendant's parents compelled him to participate in the violence. Defendant doesn't point to any missed or contrary evidence, and at this stage, we "may assume the truth of the government's allegations regarding the defendant's commission of [the] charged crime." *Leon D.M.*, 132 F.3d at 589–90. The government has alleged, and the hearing evidence demonstrated, that defendant committed this crime to settle a score—not in defense of himself or anyone else.

Last, defendant argues the district court failed to explain its findings about his intellectual development and psychological maturity and, instead, merely stated that it agreed with the magistrate judge. Yet the district court wasn't required to explain. We review "the record as a whole," which includes the magistrate judge's report and recommendation. *Doe*, 58 F.4th at 1157. The district court affirmed and adopted the magistrate judge's thorough order, which discussed each expert's conclusions and noted that both experts agreed that defendant has average intelligence. In light of this incorporated finding, the district court properly concluded that defendant had the intellectual ability to conform his conduct to the law and deliberately chose to commit a crime. Defendant's highlighting of other aspects of the experts' reports— low sophistication, immaturity, depression, dependency, and emotional overcontrol— improperly asks us to reweigh evidence that is subject to multiple interpretations.

16

In sum, there is no clear formula to determine the intellectual development and psychological maturity of a teenager with average intelligence but below-average maturity; that's why district courts are given wide discretion in weighing this and other factors. And the district court here did not abuse its discretion in concluding that a 17-years-and-eight-months-old juvenile of average intelligence could understand the wrongfulness of escalating a feud, threatening violence, bringing a gun to the fight, attacking an unarmed family, murdering one person, and severely injuring two others.

## III.    Nature of Past Treatment Efforts

Defendant next argues that the district court erred in assessing the past-treatment-efforts factor. The district court found this factor to be neutral if limited only to past treatment efforts. But applying this factor, the district court also considered defendant's amenability to future treatment.[6] In support, it cited Roberson's finding that defendant scored mid-range for treatment amenability and Grissom's finding that defendant tested "high" for treatment amenability. R. vol. 1, 526. Given these differing conclusions, the district court returned to the fundamental goals of transfer: balancing the need to encourage treatment and rehabilitation against the need to protect the public. The court found that "[d]efendant's initiation of the

---

[6] We acknowledge that amenability to treatment is not one of the six transfer factors listed in § 5032. The magistrate judge considered this as a kind of seventh factor, while the district court treated it as an aspect of the past-treatment-efforts factor. We need not decide which approach, if any, is correct, given that neither defendant nor the government contends that the district court abused its discretion by addressing this additional factor.

threats for violence, his capacity and willingness to carry out those threats, his complete disregard for human life, and his propensity to blame the victims for his disproportionate use of deadly weapons against unarmed individuals" made him dangerous to the public. *Id.* at 526–27. Notably, the district court relied on Roberson's dangerousness assessment to conclude "that [d]efendant's dangerousness to the public far outweighs his amenability to treatment." *Id.* at 527. And overall, the district court considered defendant's past treatment efforts *and* his amenability to treatment in concluding that this factor would "at least moderately if not heavily" favor transfer. *Id.* at 564.

Defendant argues that the district court improperly weighed this factor two alternative ways and "never made a final determination as to how it was balancing this factor." Aplt. Br. 31. But we don't require the district court "to state whether each specific factor favors or disfavors transfer." *Leon D.M.*, 132 F.3d at 589. And this alternative consideration came about only because—in an effort to thoroughly address defendant's arguments—the district court addressed defendant's amenability to treatment in addition to the nature of past treatment efforts. Doing so was neither clearly erroneous nor an abuse of discretion.

Defendant also complains that the district court ignored the experts' agreement that defendant is amenable to future treatment—Grissom especially, who concluded he was highly amenable to treatment and at a low risk of dangerousness. In support, defendant emphasizes only positive record evidence: he's studying to get his GED, he scored low to average on aggression, he scored low on psychopathy, he expressed

18

some guilt and remorse, and so forth. Yet defendant overlooks damaging evidence that the district court relied on, including Roberson's determination that defendant is highly dangerous based on defendant's "history of threatening to kill others and posing with guns"; "engage[ment] in the criminal offenses"; failure to take responsibility; and jail calls where he expressed no remorse for the killing and blamed Peanut for Ethan's death. R. vol. 1, 298. The district court appropriately balanced this evidence and concluded that defendant's dangerousness outweighs his possible rehabilitation, even considering his amenability to treatment. No more was required of the district court.

## IV.   Availability of Programs

Next, defendant argues the district court clearly erred when weighing the availability-of-programs factor. This factor evaluates "whether there are available rehabilitative programs within juvenile facilities that could treat the juvenile's behavioral problems." *B.N.M.*, 107 F.4th at 1177. "[T]he key inquiry" here "is whether there are available programs in juvenile facilities that could rehabilitate the juvenile—as well as, relatedly, whether the adult facilities would in fact be more likely to further the statute's rehabilitative goals." *Id.* at 1178.

As a preliminary matter, defendant insists that this factor requires the government to show that juvenile facilities *lack* available treatment programs. Not so. This factor merely requires "a comparison of adult and juvenile facilities." *Id.* (quoting *United States v. Nelson*, 68 F.3d 583, 591 (2d Cir. 1995)). The government thus bears the burden to show by a preponderance of the evidence that adult facilities

can treat the juvenile or are better suited for the juvenile, not necessarily that the juvenile facilities are lacking.

Here, the district court found this factor neutral when it concluded the government had "demonstrated that substantially equal programs exist at both the juvenile contract facilities and the adult BOP. . . facilities, with the more varied and intense programs being available at the adult facilities." R. vol. 1, 525. Nevertheless, defendant argues that the district court incorrectly assessed the programming in adult and juvenile facilities. He emphasizes that juvenile treatment programs are mandatory and adult treatments programs are not. Defendant also asserts that juvenile facilities have better programing that is tailored to the juvenile's individual needs.

But this argument asks us to rebalance this factor and consider whether the mandatory, tailored programming at juvenile facilities outweighs the broader programs available at adult facilities. As we have repeatedly indicated, that is not the proper inquiry; we ask only whether the district court abused its discretion. We cannot say that it did.

## V.    Constitutional Challenge

Finally, defendant argues that his case could not be transferred because, under the relevant murder statute, the only available punishments for first-degree murder are death or life in prison. *See* § 1111. And both punishments are unconstitutional when applied to juveniles. *See Roper v. Simmons*, 543 U.S. 551, 578 (2005) (death penalty); *Miller*, 567 U.S. at 470 (life in prison). So, defendant asserts, because any punishment he could receive would be unconstitutional, the Eighth Amendment

20

prohibits transfer to adult prosecution. He additionally contends that if the district court were to impose a different penalty upon conviction, it would effectively rewrite the statute, thereby violating the separation-of-powers doctrine. Defendant does offer out-of-circuit authority for his position. *See United States v. Under Seal*, 819 F.3d 715, 717–18 (4th Cir. 2016). But he recognizes that we have rejected this argument.

In *Doe*, we held that this exact "argument is unripe because [defendant's] potential punishments rely upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" 58 F.4th at 1155 (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)). For example, the jury could acquit defendant or convict him of second-degree murder. Or the defendant could cooperate with the government and receive a lower sentence. Given these future possibilities, *Doe* held this challenge premature, and *B.N.M.* followed suit. *Id.*; *see also B.N.M.*, 107 F.4th at 1178 (following *Doe*). We do the same and hold that this challenge is not yet ripe. *In re Smith*, 10 F.3d 723, 724 (10th Cir. 1993) ("We cannot overrule the judgment of another panel of this court. We are bound by the precedent of prior panels absent en banc reconsideration or a superseding contrary decision by the Supreme Court.").

## Conclusion

District courts have broad discretion to decide whether to transfer a juvenile to adult status, so a defendant seeking to overturn a district court's transfer decision must shoulder a heavy burden. Defendant does not do so here. He notably fails to challenge that his age and the nature of the offense weigh heavily in favor of transfer.

21

And his assertions of clear error on the other factors ask us to substitute our view for that of the district court, which we will not do. Further, we are bound to reject his constitutional argument as unripe.

The district court's order granting the government's motion to transfer defendant from juvenile to adult proceedings is affirmed.