FILED
United States Court of Appeals
Tenth Circuit

January 20, 2023

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

    No. 23-9900

JANE DOE, (Female Juvenile),

    Defendant - Appellant.

_____

Before **TYMKOVICH**, **BRISCOE**, and **PHILLIPS**, Circuit Judges.

_____

**TYMKOVICH**, Circuit Judge.

_____

Jane Doe and two boys are accused of killing Doe's parents. Even though Doe is a juvenile (she was 17 at the time of the murders), the government charged her with two counts of first-degree murder. The government successfully moved to transfer her case to adult court, where the punishments for first-degree murder are death or mandatory life imprisonment without parole. These punishments are unconstitutional when applied to a juvenile. Doe argues she cannot be transferred to adult court because, even if guilty, there is no statutory punishment available for her alleged crime. She also argues the district court used an incorrect legal standard for transfer from juvenile to adult court and improperly weighed the relevant factors for transfer.

We find that her constitutional argument is not ripe, the district court applied the correct legal standard, and the district court did not abuse its discretion in weighing the transfer factors. We therefore affirm the district court's transfer of Doe's case from juvenile to adult court.

## I. Background

When defendant Jane Doe was 17 ½ years old she allegedly orchestrated the murder of her two parents. After posturing a false pregnancy to her fifteen-year-old boyfriend and lamenting her parents' opposition to their relationship, Doe asked her boyfriend and another friend to kill her mother and father. They quickly formulated a plan. While Doe hid in the bathroom of her parents' house, the two boys snuck into the home then beat and stabbed Doe's mother multiple times. They buried the body in a crude grave and waited for Doe's father. When he arrived, the boys clubbed and set him on fire. Doe's father died of blunt force trauma and smoke and soot inhalation. Doe and the boys fled but were soon apprehended. Although Doe did not participate in the physical assaults, she was the author of the plan—the murders would not have occurred without her initiative.

The gruesome facts of the crime are preceded by a neglected and dysfunctional childhood for Doe. According to the record, she was born into an unstable and impoverished household. For the first eight years of her life, Doe lived in approximately eight different residences. Her father was a violent alcoholic, and Doe said that she had been physically abused since she was five or six years old. The Oklahoma Department of Human Services (DHS) received multiple referrals against

2

Doe's mother alleging inadequate care of her children. When Doe was nine years old, DHS took Doe and her siblings into emergency custody because of concerns of child sexual abuse. Doe's father's parental rights were terminated. Doe lived in foster care from age 9 to 13, then returned to living with her parents. When Doe was 14, her father was convicted of Sexual Abuse of a Child Under Twelve for abusing his daughter, Doe's half-sister. Beginning after Doe turned 15, she lived alone in a dirty, cluttered residence across the street from her mother and father (after he was released from the Oklahoma Department of Corrections). She was not permitted to live with her father because of his felony conviction. While Doe's parents provided her with food, electricity, and water at her house, her living conditions were nevertheless neglectful. She lacked supervision, discipline, and moral guidance.

After the crime, two experts (Dr. Roberson for the government and Dr. LaFortune for the defendant) assessed Doe. Dr. Roberson chose not to ask Doe about the nature of the offense because Doe's counsel noted that some answers may violate Doe's Fifth Amendment rights against self-incrimination. Nonetheless, both experts found that Doe had low intellectual ability and maturity for her age.

Doe is charged by juvenile information with two counts of murder under 18 U.S.C. § 1111. Since Doe is an enrolled member of the Choctaw nation and the offenses occurred on the Choctaw Nation Reservation, criminal jurisdiction is appropriate in federal court. 18 U.S.C. §§ 1152, 1153. Because Doe was a juvenile at the time of the alleged conduct, the charges implicate the Juvenile Justice and Delinquency Prevention Act, 18 U.S.C. §§ 5031–42. Under the Act, juveniles may

3

be prosecuted as adults if they are at least 15 ½ years old, they allegedly committed a felony crime of violence, and the court determines adult prosecution would be "in the interest of justice."  18 U.S.C. § 5032.

The government filed a motion to transfer proceedings from juvenile court to adult court.  The magistrate judge considered the motion and recommended that the case be transferred to adult court.  The district court judge reviewed the case de novo, adopted the recommendation, and granted the government's motion to transfer Doe's case.  Doe appeals the order, and we have jurisdiction over this appeal under the collateral order doctrine.  *See United States v. Angelo D.*, 88 F.3d 856, 857–58 (10th Cir. 1996).

## II.  Analysis

Doe advances three arguments to negate her transfer to adult court.  First, she argues it is unconstitutional to charge her with first-degree murder as an adult because no constitutional punishments are available if she is convicted.  Second, she contends the district court applied an incorrect legal standard in granting the government's motion to transfer.  Finally, she argues the district court abused its discretion when applying the six transfer factors.

### A.  *Unconstitutional Punishments and Ripeness*

Doe argues her case cannot be transferred from juvenile to adult court because the punishments for first-degree murder under 18 U.S.C. § 1111 violate the Eighth Amendment when applied to a juvenile.  We review questions of law de novo,

4

including challenges to the constitutionality of a federal statute and questions of ripeness. *See United States v. Price*, 265 F.3d 1097, 1106 (10th Cir. 2001); *New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1499 (10th Cir. 1995).

The federal murder statute at issue in this case defines murder as "the unlawful killing of a human being with malice aforethought." 18 U.S.C. § 1111(a). Subsection (a) of the statute defines both first-degree murder and the lesser-included offense of second-degree murder:

> Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, child abuse, burglary, or robbery; or perpetrated as part of a pattern or practice of assault or torture against a child or children; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.
>
> Any other murder is murder in the second degree.

*Id.* Subsection (b) includes the penalties for both first-degree and second-degree murder:

> Whoever is guilty of murder in the first degree shall be punished by death or by imprisonment for life;
>
> Whoever is guilty of murder in the second degree, shall be imprisoned for any term of years or for life.

18 U.S.C. § 1111(b).

5

Important to the present appeal, the penalties for first-degree murder—death or life imprisonment without parole—are unconstitutional when applied to juveniles. The Supreme Court has deemed these punishments excessively harsh in violation of the Eighth Amendment. *Roper v. Simmons*, 543 U.S. 551, 578 (2005) (holding "[t]he Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed."); *Miller v. Alabama*, 567 U.S. 460, 470 (2012) (concluding "mandatory life-without-parole sentences for juveniles violate the Eighth Amendment").

In the proceedings below, the district court acknowledged that the penalties for first-degree murder are unconstitutional when applied to a juvenile. But the district court found the constitutionality issue was not ripe because "the Eighth Amendment's proscription against cruel and unusual punishment is only applicable following a determination of guilt after a trial or plea." R., Vol. I at 319 (citing *Weimer v. Schraeder*, 952 F.2d 336, 340 n.5 (10th Cir. 1991)). The district court noted that it would revisit the issue should Doe be convicted.

Federal courts only have subject matter jurisdiction over cases and controversies ripe for adjudication. Evaluating cases for ripeness allows courts to avoid "premature adjudication" by refraining from "entangling themselves in abstract disagreements." *United States v. Wilson*, 244 F.3d 1208, 1213 (10th Cir. 2001). The test for ripeness requires us to consider "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration" until

6

a later time. *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003); *Wilson*, 244 F.3d at 1213.

If waiting to decide a case would put us in a better position to resolve the dispute, such as when further factual development would help us adjudicate the case, the case may be unripe and therefore nonjusticiable. *See, e.g., Nat'l Park*, 538 U.S. at 812 (quotation omitted) (finding that "further factual development would significantly advance our ability to deal with the legal issues presented."). In other words, "[a] claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 580–81 (1985)).

On appeal, Doe argues her constitutional argument is ripe because (1) the issue is fit for a judicial decision, and (2) she would suffer hardship if we withheld consideration until a later time. *See Wilson*, 244 F.3d at 1213 (stating the two-part test for ripeness). Doe requests that we reverse and order the district court to deny the motion to transfer.

Regarding fitness, Doe argues her case is fit for a judicial decision because her charges carry penalties—death or life imprisonment without parole—that violate the Eighth Amendment. *See* 18 U.S.C. § 1111(b). Doe argues these inapplicable penalties satisfy the threshold question of fitness for justiciability because her unconstitutional prosecution bears on eligibility for transfer from juvenile to adult court. As to hardship, Doe argues she would lack notice of her possible penalties,

7

and that this hardship violates due process.  The Fifth Amendment "requires that the range of available sentences be specified with sufficient clarity," and Doe contends her possible sentences are not clear.  *Johnson v. United States*, 576 U.S. 591, 594–97 (2015).

We agree with the district court.  Doe's argument is unripe because her potential punishments rely upon "contingent future events that may not occur as anticipated, or indeed may not occur at all."  *Texas v. United States*, 523 U.S. 296, 300 (1998).  Doe could be acquitted, be convicted of second-degree murder, plea to a lesser-included offense, or even be convicted for first-degree murder but receive a lower sentence.[1]  Because of these contingences, the court will be in a better position to assess the constitutionality of Doe's punishment after further factual development.  *See Nat'l Park*, 538 U.S. at 812; *Sealed Appellee 1 v. Sealed Juv. 1*, No. 15-20262, 2018 WL 11335611, at *3 (5th Cir. Mar. 9, 2018) (dismissing interlocutory appeal of juvenile transfer on ripeness grounds because sentencing for murder charge had not yet occurred and acknowledging that defendant "raised an important constitutional question that may deserve a thorough review when the appropriate time comes").

As is apparent, these future contingencies can play out without the need to impose an unconstitutional sentence.  One recent example can be found in *United States v. Bonilla-Romero*, 984 F.3d 414, 420 (5th Cir. 2020).  In that case, the Fifth

---

[1]  A defendant who cooperates with the government may be given a lower sentence due to assistance with other prosecutions, or the government can move for a below-statutory minimum sentence under 18 U.S.C. § 3553(e).

Circuit found a juvenile defendant's collateral attack on the constitutionality of his transfer to be premature. *Id.* The court later addressed the constitutionality of the first-degree murder statute at the juvenile's *sentencing*, after the juvenile was transferred to adult court and pled guilty. *Id.* (concluding juvenile defendant was eligible for sentencing under 18 U.S.C. § 1111(b)'s second-degree murder provisions).

The parties focus much of their briefing on the possibility of severing the first-degree murder statute, such that a constitutional punishment could be available for a juvenile. They cite two cases discussing this proposition, *Bonilla-Romero*, 984 F.3d at 418, and *United States v. Under Seal*, 819 F.3d 715, 723 (4th Cir. 2016). But we need not address severance because Doe's argument about her unconstitutional punishment is not ripe.

In summary, we hold that Doe's challenge to the constitutionality of the charges against her is not ripe because future contingencies make a ruling on her argument a "premature adjudication." *United States v. Wilson*, 244 F.3d 1208, 1213 (10th Cir. 2001) (finding the ripeness doctrine is intended to "prevent courts, through the avoidance of premature adjudication, from entangling themselves in abstract disagreements"). Doe may effectively raise this argument again at a future point in the proceedings.

### B. Juvenile Transfer to Adult Court

Doe also challenges the merits of her transfer. She argues (1) the district court applied the incorrect test for transferring a juvenile to adult court, and (2) the district

court abused its discretion by finding the transfer factors weighed in favor of prosecuting Doe as an adult.  We review statutory interpretation and legal standards de novo.  *United States v. Brian N.*, 900 F.2d 218, 220 (10th Cir. 1990).  We review a district court's decision regarding a juvenile transfer motion for an abuse of discretion.  *United States v. McQuade Q.*, 403 F.3d 717, 719 (10th Cir. 2005).

In general, children who commit crimes before the age of 18 should be tried as juveniles.  *Id.* (finding that "[j]uvenile adjudication is presumed appropriate").  As the Supreme Court has noted, "children are constitutionally different from adults for purposes of sentencing."  *Miller v. Alabama*, 567 U.S. 460, 471 (2012).  Children are "less deserving of the most severe punishments" because they "have diminished culpability and greater prospects for reform."  *Id.* (quotation omitted).  Because of these inherent differences, juveniles may only be tried as adults when the government establishes that prosecution as an adult is "in the interest of justice," as part of the federal juvenile delinquency process.  *United States v. Leon, D.M.*, 132 F.3d 583, 589 (10th Cir. 1997) (citing 18 U.S.C. § 5032).

"The purpose of the federal juvenile delinquency process is to remove juveniles from the ordinary criminal process in order to avoid the stigma of a prior criminal conviction and to encourage treatment and rehabilitation."  *McQuade*, 403 F.3d at 719 (quotation omitted).  District courts considering juvenile transfer motions "must balance this important interest against the need to protect the public from dangerous individuals."  *Id.*  Juvenile adjudication is "presumed appropriate" unless the government establishes by a preponderance of the evidence "that a transfer to

10

adult status is warranted" in the interests of justice. *United States v. David A.*, 436 F.3d 1201, 1213–14 (10th Cir. 2006); *Leon*, 132 F.3d at 589; 18 U.S.C. § 5036.

The Juvenile Justice and Delinquency Prevention Act, 18 U.S.C. §§ 5031–42, provides six statutory factors to guide district courts in determining whether transfer to adult status is "in the interest of justice." *Id.* at § 5032. The factors are: (1) the age and social background of the juvenile; (2) the nature of the alleged offense; (3) the extent and nature of the juvenile's prior delinquency record; (4) the juvenile's present intellectual development and psychological maturity; (5) the nature of past treatment efforts and the juvenile's response to such efforts; and (6) the availability of programs designed to treat the juvenile's behavioral problems. *Id.*

A district court must consider and make findings with respect to each factor. *See McQuade*, 403 F.3d at 719. The district court is not required, however, to give equal weight to each factor. *Id.* Instead, the court may balance the factors as it deems appropriate. *Id.* The court is not required to state whether each specific factor favors or disfavors transfer. *Id.* at 719–20.

A defendant bears "a heavy burden" in seeking to overturn the district court's transfer decision. *Leon*, 132 F.3d at 590. "A district court abuses its discretion in deciding whether to transfer a juvenile to adult status when it fails to make the required factual findings or when its factual findings are clearly erroneous." *Id.* The district court's decision may not be overturned simply because an appellate court might have reached a different conclusion had it considered the matter in the first instance. *Id.*; *McQuade*, 403 F.3d at 719.

11

Doe first argues the district court used an inapplicable balancing test when considering transfer and thus made reversible error. She contends the district court failed to properly consider the interests of juvenile rehabilitation afforded by the juvenile judicial process and the need to protect society from harmful individuals.

Considering the record as a whole, we disagree. The district court (and the magistrate judge in her report and recommendation) considered each factor, ultimately concluding the defendant's risk to society outweighed the potential benefits of a juvenile adjudication. R., Vol. I at 314-19. The district court correctly framed the legal test for transferring a juvenile to adult court. The test for transfer is not obscure or ambiguous—Doe and the district court both relied on 18 U.S.C. § 5032 and Tenth Circuit cases *David A.*, 436 F.3d at 1213–14, *McQuade*, 403 F.3d at 719, and *Leon*, 132 F.3d at 589. In reaching its conclusion, the district court also cited to the Sixth Circuit's decision in *United States v. One Juvenile Male* in support of its decision to transfer Doe. 40 F.3d 841, 844 (6th Cir. 1994). But that case is consistent with Tenth Circuit juvenile transfer case law and is a relevant example of courts considering the six-factor test and finding that the risk to society factor could be paramount in approving a motion to transfer.[2]

---

[2] Doe argues the district court's quotation of "harm to society" from *One Juvenile Male* suggests the district court misunderstood the proper legal test. *See* 40 F.3d at 844 ("[A] motion to transfer is properly granted where a court determines that the risk of harm to society posed by affording the defendant more lenient treatment within the juvenile justice system outweighs the defendant's chance for rehabilitation."). In context, we see no basis to believe the district court was not applying applicable law.

Doe next takes issue with the district court's evaluation of the transfer factors. In particular, she contends the court's findings as to the final two factors are clearly erroneous. Doe challenges the district court's findings for factor five, the nature of past treatment efforts and the juvenile's response to such efforts, and factor six, the availability of programs designed to treat the juvenile's behavioral problems.

Regarding factor five, response to treatment efforts, the district court noted that the parties dispute whether this factor concerns Doe's responses to past treatment, as the government contends, or the efficacy of past *and future* treatment, as Doe contends. The district court adopted the magistrate judge's findings that past treatment was not successful and found Doe was moderately amenable to future treatment, but that there would be difficulties. The district court held that under either theory—past treatment or past and future treatment—this factor weighed in favor of transfer.

Doe argues that she responded favorably to past treatment when she lived in foster care and when she was held at the Sac & Fox Juvenile Detention Center. While in foster care, a counselor reported that Doe "has improved since being in custody, by talking and being more sociable" and that she had "opened up more," although she was still guarded. R. Supp., Vol. II at 60. Additionally, Doe would have liked continued services and her counselors thought her time in treatment had been "somewhat beneficial." R., Vol. I at 51. While at the detention center, Doe actively engaged in services and did not exhibit negative behavior. And Doe's expert

13

noted that treatment for juveniles is generally difficult, which contradicts the district court's findings that it would be difficult to treat Doe in particular.

We find that Doe's argument fails because, although Doe may have responded favorably to past treatment, the district court did not fail to make factual findings or make clearly erroneous findings. *See McQuade*, 403 F.3d at 719. The district court considered future treatment in its determination of factor five, as Doe requested, and its assessment in favor of transfer is not clearly erroneous. *Id.* The magistrate judge presided over extensive evidentiary hearings and reviewed expert witness reports and testimony and is thus in the best position to make this factual determination.[3]

Regarding factor six, available programming, the district court found the factor to be "a wash." R., Vol. I at 318. The three juvenile facilities have voluntary treatment options, but juveniles must leave the facility on their twenty-first birthday. The magistrate judge found that only adult facilities offered intensive residential substance-abuse and trauma-based treatment that Doe needs.

Doe argues the district court erred in this finding because intensive residential treatment programs are only available in low-security adult prisons, and Doe may be placed in a high-security facility without such programming. Additionally, she

---

[3] Doe also claims the district court erred by finding her treatment failed because Doe ultimately assisted in the murders. Doe argues that if being charged with a serious crime equaled "unsuccessful treatment" then there would be no need for factor five. But the district court did not hold Doe's crime against her while assessing her response to past treatment or amenability to future treatment, thus we find this argument unpersuasive.

contends the district court omitted testimony that Doe would likely be placed in a facility with programs meeting her needs if she were in the juvenile justice system.

We find that Doe's argument again fails to meet the clearly erroneous standard required for reversal. *See McQuade*, 403 F.3d at 719. While Doe's claims about programming are reasonable, they do not necessarily change the district court's evaluation that factor six is "a wash." Doe does not have certainty about programming in either adult or juvenile facilities, even if she has a better chance of more effective programming in a juvenile facility.

Doe's arguments do not make factors five or six outcome-determinative. Even if factors five and six favored placement in a juvenile facility, these factors are not so persuasive as to make the district court's contrary determination, in aggregate, an abuse of discretion. *See McQuade*, 403 F.3d at 719.

In total, the district court independently addressed each of the six transfer factors. R., Vol. I at 314–18. And the district court also adopted the magistrate judge's extensive findings regarding the six factors. *Id.* at 268–74. Construing the facts in Doe's favor, two factors may weigh in favor of transfer (factors one and two: age and social background and nature of the alleged offense), and four factors may weigh against transfer (factors three, four, five, and six: prior delinquency, present intellectual development, response to treatment efforts, and available programming).[4]

---

[4] Regarding factor one, age and social background, Doe is close to adulthood which may support transfer. *See*, *e.g.*, *United States v. Juvenile Male*, 554 F.3d 456, 468–69 (4th Cir.2009); *United States v. Dion L.*, 19 F. Supp. 2d 1224, 1225 (D.N.M.

It is possible that, considering all six factors on our own, we might not have granted transfer. *See id.* at 586–87 (affirming denial of adult prosecution when only two factors favored transfer). But the possibility an appellate court "might have reached a different conclusion had it considered the matter in the first instance" is insufficient to overrule the district court's transfer order. *See McQuade*, 403 F.3d at 719. To constitute an abuse of discretion, the district court must have failed to find facts or the factual findings must be clearly erroneous, and neither error is present in this case. *Id.*

The dissent notes additional facts in Doe's favor for factors one, five, and six. But the question is not whether the factors weigh for or against transfer; instead, the question is whether the district court abused its discretion. And on that question, we cannot agree with the dissent's finding of clear error.

---

1998) (finding a juvenile crime committed two months before defendant's eighteenth birthday favored transfer to adult status). Although Doe's social background was dysfunctional, it was reasonable for the district court to find this factor weighed in favor of transfer. According to the dissent, the magistrate judge's finding that Doe's family life was "routine" makes the court's analysis clearly erroneous. We do not agree—Doe's family life was clearly unstable and neglectful, but the district court acknowledged this dysfunction and correctly considered Doe's social background alongside age in factor one. Any error was harmless. Regarding factor two, the nature of the alleged offense, Doe concedes that the gruesome nature of the crime favors transfer. *See Leon*, 132 F.3d at 590 ("[S]ome of those factors (particularly Leon's age and the heinousness of the alleged offense) provide support for treating him as an adult."). Factor three, prior delinquency, is not disputed because Doe had no prior record and thus this factor weighs against transfer. Factor four, present intellectual development, weighs against transfer because Doe has low intellectual maturity for her age. Factors five and six may weigh against transfer, see *supra* part II.B.

16

A district court's reasoning must apply the facts to the statutory test and balance "[t]he purpose of the federal juvenile delinquency process" (avoiding the stigma of prior criminal conviction and encouraging treatment and rehabilitation) against "the need to protect the public from dangerous individuals," and to use the six statutory transfer factors to aid in its balancing. *Id.* The district court did so in Doe's case when it adopted the magistrate judge's finding "[a]fter consideration of the entirety of the record as well as the requirements of § 5032." R., Vol. I at 275. Although the district court judge could have been more expository and the magistrate judge could have engaged in more explicit balancing, the judges did not abuse their discretion in weighing the six factors for juvenile transfer and correctly considered them in the light of the overarching transfer standard: "in the interest of justice." 18 U.S.C. § 5032.[5]

In sum, given Doe's age—nearly 18 years old—at the time of the alleged offense, the heinousness of the crime, the callousness of her participation, and her leadership role, we conclude the district court did not abuse its discretion in granting the government's motion to transfer. Although we ultimately disagree with the dissent on the proper outcome for Doe's case, we reiterate that courts reviewing juvenile transfer should describe the legal standard for transfer including the

---

[5] For example, the district court described its task as "weighing" the various factors. R., Vol. I at 316. Similarly, the magistrate judge described her task as to "balance [the] factors" while acknowledging that the factors did not receive "equal weight." R., Vol. I at 267.

statutory factors, summarize the evidence they relied on, and explain their reasoning to the best of their ability. We are satisfied the district court did so in this case.

## III. Conclusion

Doe's constitutional challenge is unripe, and the district court did not abuse its discretion in applying the correct legal standard for juvenile transfer. We affirm the district court.

*United States v. Doe*
**BRISCOE**, Circuit Judge, concurring in part and dissenting in part.

I concur in part and dissent in part. I agree with the majority that Doe's constitutional argument is unripe. Further, regarding Doe's challenges to the district court's decision to grant the government's motion to transfer, I agree with the majority that the district court properly identified and at least minimally discussed the statutory factors outlined in 18 U.S.C. § 5032 for transferring a juvenile to adult status. I part ways with the majority, however, on the ultimate question of whether the district court abused its discretion in granting the government's motion to transfer. As to that overarching question, I conclude that the district court (a) expressly adopted clearly erroneous factual findings made by the magistrate judge regarding three of the statutory factors, (b) adopted a legally incorrect interpretation of one of the statutory factors outlined in § 5032, and (c) ultimately failed to offer any explanation regarding how it weighed all of the statutory factors and arrived at its conclusion that a transfer was appropriate. As a result, I would vacate the district court's decision and remand the matter to the district court for further consideration of the government's motion to transfer.

*Section 5032 of the Juvenile Justice and Delinquency Prevention Act*

The government's motion to transfer is based upon § 5032 of the Juvenile Justice and Delinquency Prevention Act (the Act). Section 5032 outlines, in pertinent part, when federal courts may exercise jurisdiction over a juvenile alleged to have committed an act of juvenile delinquency, and when a juvenile may be tried as an adult in federal court:

A juvenile alleged to have committed an act of juvenile delinquency, other than a violation of law committed within the special maritime and territorial jurisdiction of the United States for which the maximum authorized term of imprisonment does not exceed six months, shall not be proceeded against in any court of the United States unless the Attorney General, after investigation, certifies to the appropriate district court of the United States that (1) the juvenile court or other appropriate court of a State does not have jurisdiction or refuses to assume jurisdiction over said juvenile with respect to such alleged act of juvenile delinquency, (2) the State does not have available programs and services adequate for the needs of juveniles, or (3) the offense charged is a crime of violence that is a felony or an offense described in section 401 of the Controlled Substances Act (21 U.S.C. 841), or section 1002(a), 1003, 1005, 1009, or 1010(b)(1), (2), or (3) of the Controlled Substances Import and Export Act (21 U.S.C. 952(a), 953, 955, 959, 960(b)(1), (2), (3)), section 922(x) or section 924(b), (g), or (h) of this title, and that there is a substantial Federal interest in the case or the offense to warrant the exercise of Federal jurisdiction.

If the Attorney General does not so certify, such juvenile shall be surrendered to the appropriate legal authorities of such State. For purposes of this section, the term "State" includes a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States.

If an alleged juvenile delinquent is not surrendered to the authorities of a State pursuant to this section, any proceedings against him shall be in an appropriate district court of the United States. For such purposes, the court may be convened at any time and place within the district, in chambers or otherwise. The Attorney General shall proceed by information or as authorized under section 3401(g) of this title, and no criminal prosecution shall be instituted for the alleged act of juvenile delinquency except as provided below.

A juvenile who is alleged to have committed an act of juvenile delinquency and who is not surrendered to State authorities shall be proceeded against under this chapter unless he has requested in writing upon advice of counsel to be proceeded against as an adult, *except that, with respect to a juvenile fifteen years and older alleged to have committed an act after his fifteenth birthday which if committed by an adult would be a felony that is a crime of violence or an offense described in section 401 of the Controlled Substances Act (21 U.S.C. 841), or section 1002(a), 1005, or 1009 of the*

2

*Controlled Substances Import and Export Act (21 U.S.C. 952(a), 955, 959), or section 922(x) of this title, or in section 924(b), (g), or (h) of this title, criminal prosecution on the basis of the alleged act may be begun by motion to transfer of the Attorney General in the appropriate district court of the United States, if such court finds, after hearing, such transfer would be in the interest of justice.*

*. . . .*

*Evidence of the following factors shall be considered, and findings with regard to each factor shall be made in the record, in assessing whether a transfer would be in the interest of justice: the age and social background of the juvenile; the nature of the alleged offense; the extent and nature of the juvenile's prior delinquency record; the juvenile's present intellectual development and psychological maturity; the nature of past treatment efforts and the juvenile's response to such efforts; the availability of programs designed to treat the juvenile's behavioral problems. In considering the nature of the offense, as required by this paragraph, the court shall consider the extent to which the juvenile played a leadership role in an organization, or otherwise influenced other persons to take part in criminal activities, involving the use or distribution of controlled substances or firearms. Such a factor, if found to exist, shall weigh in favor of a transfer to adult status, but the absence of this factor shall not preclude such a transfer.*

18 U.S.C. § 5032 (emphasis added).

The purpose of the Act, as exemplified by § 5032, "is to 'remove juveniles from the ordinary criminal process in order to avoid the stigma of a prior criminal conviction and to encourage treatment and rehabilitation.'" *United States v. Angelo D.*, 88 F.3d 856, 858 (10th Cir. 1996) (quoting *United States v. Brian N.*, 900 F.2d 218, 220 (10th Cir. 1990)). This purpose, however, "must be balanced . . . against the need to protect the public from violent and dangerous individuals and providing sanctions for antisocial

3

acts." *United States v. Leon D.M.*, 132 F.3d 583, 588–89 (10th Cir. 1997) (internal quotation marks omitted).

We have held, construing § 5032, that "juvenile adjudication is presumed appropriate, and the government bears the burden of establishing," by a preponderance of the evidence, "that a transfer to adult status is warranted." *United States v. David A.*, 436 F.3d 1201, 1213 (10th Cir. 2006). A district court evaluating a motion to transfer a juvenile to adult prosecution is required to consider and make findings on all six of the factors outlined in § 5032, but is not required to give equal weight to each factor or to state whether each factor favors or disfavors transfer. *United States v. McQuade Q.*, 403 F.3d 717, 719–20 (10th Cir. 2005).

"Appellate review of § 5032 transfer decisions is quite deferential." *Leon D.M.*, 132 F.3d at 590. Specifically, "[t]hese decisions are reviewed for an abuse of discretion, and . . . an appellant bears a heavy burden in seeking to overturn them." *Id.* (internal quotation marks omitted).

*Statutory factor #1 (age and social background)*

The first statutory factor listed in § 5032 is "the age and social background of the juvenile." 18 U.S.C. § 5032. The district court acknowledged this factor and discussed, at some length, Doe's age at the time of the alleged crimes. As for Doe's social background, the district court stated only that "the phrase 'very dysfunctional background' . . . is applicable," and it immediately stated thereafter that it was "not persuaded this aspect overrule[d] the age factor." ROA, Vol. I at 862. Otherwise, the

4

district court simply "affirmed and adopted" the factual findings made by the magistrate judge. *Id.* at 867.

In her appeal, Doe argues that the magistrate judge's findings regarding her social background, which the district court adopted and implicitly relied on, were clearly erroneous. Specifically, Doe argues that "[t]he Magistrate's Report repeatedly minimized [her] background" and ultimately and erroneously found that her "relationship with her parents appeared to be relatively routine <u>since 2016</u>." Aplt. Br. at 44 n.8 (emphasis in original).

I agree with Doe. According to the record, Doe was approximately thirteen years old in 2016 and had just been returned to her parents after having been in foster care since age nine. In 2017, Doe's father was convicted of raping Doe's half-sister and, as a result, he was incarcerated in 2017 and 2018 and his parental rights were terminated. Nevertheless, after he was released from prison and until the time of the murders, he and Doe's mother lived in a camper that was parked across the road from the house where Doe lived (the house was owned by Doe's aunt). As a result, Doe, then a teenager, was effectively subject to control by her father and mother, but yet was left to live alone in a house that was, due to its lack of maintenance and cleaning, likely unfit for human habitation. *See* United States' Supplement to Joint Motion to Supplement the Record, Vol. 4 at 67–74 (photographs of the outside and inside of Doe's house). Doe asserts, and I agree, that "[n]othing about this is 'routine,' and nothing about [her] childhood could accurately be characterized as 'routine.'" Aplt. Br. at 44 n.8. I therefore conclude that

5

the district court abused its discretion to the extent it implicitly relied on this clearly erroneous factual finding about Doe's social background in arriving at its conclusion that transferring Doe to adult status was in the interest of justice.

*Statutory factor #5 (past treatment efforts and amenability to future treatment efforts)*

The fifth statutory factor listed in § 5032 is "the nature of past treatment efforts and the juvenile's response to such efforts."  18 U.S.C. § 5032.  In the district court, the parties disputed the meaning and purpose of this factor.  The magistrate judge concluded, in her proposed findings and recommendation, that "[w]hile considerable effort was provided at the hearing and in the briefing concerning [Doe's] ability to benefit from future treatment, [the magistrate judge] d[id] not perceive this to be the requirements of this factor."[1]  ROA, Vol. I at 821.  Doe objected to the magistrate judge's conclusion and argued that the undisputed facts indicated Doe was amenable to treatment.  She argued that these omitted facts were crucial to the crux of the transfer decision which requires the district court's "balancing on one hand the Act's presumption that a juvenile should benefit from treatment and rehabilitation and on the second hand the need to protect the public from dangerous individuals."  *Id*. at 301.  The district court, in its order granting the government's motion to transfer, considered and summarily rejected Doe's objection. In doing so, it stated that "[u]nder either view" offered by the parties, it "[wa]s not persuaded this factor require[d] a different ultimate result than the Magistrate

---

[1] The magistrate judge did not otherwise offer her interpretation of the purpose of this statutory factor.

recommended." *Id*. at 865. The district court also, at the conclusion of its order, expressly adopted the magistrate judge's recommendations. *Id*. at 867.

Doe argues in her appeal that both the magistrate judge and the district court misinterpreted this statutory factor to her detriment. She argues that "[b]y renouncing the relevance of a juvenile's ability to benefit from future treatment, the [district] court rejected the correct test . . . that requires a balancing of the 'important interests' of rehabilitation and treatment versus protecting the public from a dangerous individual." Aplt. Br. at 45. She in turn argues that "[n]umerous courts have correctly considered the juvenile's 'ability to benefit from future treatment' as an important part of the mandated assessment of § 5032." *Id*.

I agree with Doe. Although § 5032 does not expressly mention the juvenile's "ability to benefit from future treatment," that, in my view, is the general intent of Factors #5 ("the nature of past treatment efforts and the juvenile's response to such efforts") and #6 ("the availability of programs designed to treat the juvenile's behavioral problems"), at least when those two factors are considered together. *See generally United States v. SLW*, 406 F.3d 991, 994–95 (8th Cir. 2005) (discussing district court's assessment of juvenile's "*reasonable prospects of rehabilitation*") (emphasis added)*; United States v. Brandon P.*, 387 F.3d 969, 977 (9th Cir. 2004) ("We decline to hold that a district court must accept an expert's opinion regarding *a juvenile's chances for rehabilitation*") (emphasis added); *United States v. Bilbo*, 19 F.3d 912, 916 (5th Cir. 1994) (discussing juvenile's "*prospects for rehabilitation*") (emphasis added). Indeed, there could be no

7

other purpose for a district court to consider these two factors other than to determine the likelihood of the juvenile benefitting from available treatment options.  Thus, I agree with Doe that the magistrate judge erred in concluding that Doe's amenability to treatment was not a relevant factor under § 5032, and the district court also erred in effectively discounting the relevance of this factor.

Doe also argues in her appeal that the magistrate judge's findings regarding Factor #5, which were expressly adopted by the district court, were clearly erroneous in a number of respects.  To begin with, Doe argues that the magistrate judge clearly erred in finding that attempts to treat Doe in the past were unsuccessful.  In support, Doe notes that, unlike some juvenile offenders who had significant experience with the juvenile justice system and in turn were given repeated opportunities for treatment in that system, she "had no prior juvenile delinquency" and thus did not have those same treatment opportunities.  Aplt. Br. at 47.  Doe in turn notes that the past treatment efforts occurred "primarily when she was in foster care" and "the undisputed evidence was that [she] responded favorably to" those treatment efforts.  *Id*.

A review of the record confirms Doe's assertion that her past treatment efforts were largely confined to the period between February 2012 and January 2014, a time when she was in foster care.  ROA, Vol. I at 51.  It does not, however, confirm Doe's assertion that she responded favorably to those specific treatment efforts.  According to the counselor who saw Doe during that time period, "he had not been able to gain rapport with her and . . . she would not open up to him."  *Id*. at 42.  "He observed her to have no

8

social skills at all, that she did not know how to interact with other people, and he believed that [her father] had molested her because she was like in a shell and would not open up to him." *Id*.

The only other indication in the record of past treatment efforts (aside from Doe's occasional meetings with her school counselor, which generally do not involve treatment) was Doe's voluntary participation in substance abuse counseling after she was arrested for the murders. *Id*. at 53. According to Dr. LaFortune, Doe's forensic psychologist, "these current services appear to be helping [Doe] become aware of her emotions, stabilizing her fear and anxiety, teaching her prosocial skills for interacting with others, and making better decisions." *Id*. at 88. Further the progress notes from the juvenile detention facility indicate that Doe has "had no behavioral or mental health incidents," is "routinely pleasant to staff," and in a "good mood" and "has a positive attitude." *Id*. at 53.

Dr. LaFortune noted in her report to the district court that "[i]t [wa]s to be expected that [Doe] did not make significant gains in therapy while she was in [Department of Human Services] custody and certainly not afterwards, considering she was returned to the family in which her father's parental rights had been terminated as well as her mother who chose to support her husband over multiple allegations of sexual indiscretions over a twenty-year period." *Id*. at 76. Dr. LaFortune further noted that, "[i]n addition, the component of enormous fear of parental retribution she expressed should her abuse be discovered by anyone was repeated throughout her interviews and

9

was a concern in every incident in which she was present in a community setting such as at a doctor, teacher, or treatment provider." *Id*. In sum, Dr. LaFortune noted that "[t]he most important point to be made here is that [Doe] has never had the opportunity to receive appropriate services in conjunction with the safety and security of a positive environment, thereby reducing her anxiety and raising her ability to concentrate on actual treatment."[2] *Id*. at 76. Notably, neither the magistrate judge nor the district court addressed, let alone adopted or rejected, these statements from Dr. LaFortune in considering Factor #5.[3]

---

[2] Dr. Roberson, the government's forensic psychologist, noted in his report that he "was not provided any current or past treatment records." ROA, Vol. I at 127. He did note, however, that "[a]ccording to FBI interviews of officials where [Doe] has been housed" since her arrest, "she has displayed positive behavior and no significant infractions." *Id*. Roberson further noted that, based upon Dr. LaFortune's psychological testing results, Doe would likely "be cooperative with treatment." *Id*. at 128. He also noted: "I suspect that [Doe] might be sufficiently cooperative with treatment, but this is not a prognostication as to the likelihood she would benefit from treatment, as I was unable to formally score that aspect of" a test called the "Risk-Sophistication-Treatment Inventory." *Id*. at 125, 128.

[3] Both the magistrate judge and the district court, presumably due to the magistrate judge's erroneous conclusion that amenability to treatment was not relevant to the interest of justice analysis, also effectively ignored the following statement in Dr. LaFortune's report regarding Doe's amenability to treatment:

"she is a suitable candidate for treatment in that she has no history of court involvement for delinquency, has mental disorders that can respond well to treatment, is motivated for treatment, that she has some awareness of her difficulties now that she has been in custody for the past several months and wants to change, that she is hopeful about change and expects to improve, that she has voiced remorse for the alleged crime, that she can display empathy for others, has a knowledge of right and wrong, but

10

Doe also argues in her appeal that the magistrate judge, in considering Factor #5, "commit[ted] a logical fallacy by stating" in her report "that 'other [treatment] efforts' 'were not successful as evidenced by . . . ultimately, [Doe's] role in the murders.'" Aplt. Br. at 48. Doe notes that "[e]very single juvenile who is the subject of a transfer motion pursuant to the Juvenile Act has been charged with a serious crime," and that "[i]f being charged with a serious crime equaled 'unsuccessful treatment,' then there would be no need for Factor #5." *Id.* I fully agree with Doe on this point. A juvenile's commission of a crime, standing alone, cannot be construed as meaning that the juvenile failed to respond to prior treatment or is not amenable to future treatment. Otherwise, there would be no point in a court considering either Factors #5 or #6.

In sum, I agree with Doe that the district court erred by adopting the magistrate judge's erroneous legal interpretation of, and factual findings regarding, Factor #5.

*Statutory factor #6*

The final factor listed in § 5032 is "the availability of programs designed to treat the juvenile's behavioral problems." 18 U.S.C. § 5032. In addressing Factor #6, the magistrate judge found in her report, based upon testimony from a witness at the evidentiary hearing, that (1) "the Bureau of Prisons contracts with three facilities dedicated to juvenile offenders," (2) that juveniles "age out of the[se] facilities" when

---

importantly, does not and never has had a family that has been stable and supportive."

ROA, Vol. I at 88.

11

they reach age 21, and (3) that these juvenile facilities offer voluntary and outpatient "educational programs, mental health programs, and drug and sex abuse treatment." ROA, Vol. I at 813.  The magistrate judge also found that the Bureau of Prison's "adult facilities offer residential drug and trauma treatment," as well as "educational and vocational training." *Id.*

Doe argues in her opening appellate brief that the magistrate judge's findings on Factor #6, which were adopted by the district court, were clearly erroneous because they omitted key pieces of testimony from the government's witness, specifically that (a) the residential treatment programs he testified about in the Bureau of Prison's adult facilities are only available in low-level security facilities, (b) that if Doe were designated to a high-level security facility for adult offenders, none of those residential treatment programs would be available to her, and (c) that one of the juveniles facilities (located in South Dakota) would have programs that would meet Doe's needs.  Although the government correctly notes in response that this same witness testified that he could not predict with any accuracy what level of facility Doe would be assigned to if she were convicted as an adult, the fact remains that the magistrate judge's findings on Factor #6 omitted these key points.  And, in turn, these omissions undercut the magistrate judge's findings on Factor #6, which, at least in my view, imply that Doe would have more substantial treatment options available to her if she were treated as an adult offender.  The omissions also undercut the magistrate judge's subsequent analysis of Factor #6, in which she stated: "it appears that [Doe] is in need of intensive substance abuse and trauma-

12

based treatment," and "[o]nly the adult facilities offer the more intensive residential treatment from which [she] could benefit." *Id.* at 821.

Although the district court purported to adopt the magistrate judge's findings and conclusions, it is simply unclear what role, if any, those findings and conclusions regarding Factor #6 played in the district court's ultimate conclusion that Doe's transfer to adult prosecution was in the interest of justice. That is because the district court only had this to say regarding Factor #6:

> Finally, regarding "the availability of programs designed to treat the juvenile's behavioral problems," the court finds this factor to largely be "a wash." There are three juvenile facilities, which are not run by the Bureau of Prisons. All treatment (for juveniles or adults) is voluntary. Even if convicted as a juvenile, an individual must leave the juvenile facility on his or her 21st birthday.

*Id.* at 865–66 (citations omitted).

### *The district court's grant of the motion to transfer*

In the end, the key question we face is whether the district court abused its discretion in granting the government's motion to transfer. Although we have held that a district court is not required to give equal weight to each of the six statutory factors outlined in § 5032, implicit in that holding is the notion that a district court must assign some weight, even if that is no weight, to each of the statutory factors and then determine, based upon these assigned weights, whether a transfer to adult status "is in the

13

interest of justice."[4]  18 U.S.C. § 5032.  It is also useful, and indeed I would submit typically necessary, for a district court to offer some explanation for how it weighed the statutory factors and arrived at its ultimate conclusion that a transfer was or was not in the interest of justice.

Here, the district court briefly discussed most of the statutory factors.  But it is unclear what, if any, weight the district court assigned to each of the statutory factors.  Further, although the district court concluded that "[t]ransfer to adult prosecution [wa]s 'in the interest of justice' under 18 U.S.C. § 5032," it offered virtually no explanation for how it arrived at this conclusion.  Although the abuse of discretion standard that we apply in this case is, typically speaking, highly deferential, I am unable and unwilling to defer to the district court's decision in this case because I am left not knowing how (or really even if) the district court exercised its discretion.  I also cannot defer to the district court's conclusion that Doe's transfer is "in the interest of justice" when I am left not knowing how the district court's decision was impacted by its adoption of the magistrate judge's legal misinterpretation and erroneous factual findings.

Remand is appropriate here to afford the district court an opportunity to more carefully address the § 5032 factors.

---

[4] I do not mean to suggest that a district court must assign a specific numerical weight to each of the six statutory factors.  It would suffice, in my view, for a district court to characterize a factor as carrying, for example, "substantial," "significant," "little," or "no" weight.